FILED

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF** 2009 MAR -6  AM 10: 54
**HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District: Middle District of Florida |
|---|---|
| Name (under which you were convicted):<br>    Eddie Lee Sexton. | Docket or Case No.:<br><br>8' 09 C V 404-T    26 TBM |
| Place of Confinement: Union Correctional Institution, 7819 NW 228th Street, Raiford, FL 32026 | Prisoner No.:<br>532757 |
| Petitioner<br>    Eddie Lee Sexton                    v. | Respondent<br>    Walter A. McNeil, Secretary,<br>    Florida Department of<br>    Corrections |
| The Attorney General of the State of:    Florida | |

## PETITION

1.   (a) Name and location of court that entered the judgment of conviction you are
     challenging: the Circuit Court of the Thirteenth Judicial Circuit, in and for
     Hillsborough County, Florida.

     (b) Criminal docket or case number (if you know): 94-1299

2.   (a) Date of the judgment of conviction (if you know): November 18, 1998
     (b) Date of sentencing: November 18, 1998

3.   Length of sentence: Death

4.   In this case, were you convicted on more than one count or of more than one
     crime? Yes ☐  No ☒

5.   Identify all crimes of which you were convicted and sentenced in this case: First
     degree murder.

6.   (a) What was your plea? (Check one)
        (1) Not guilty ☒                    (3) Nolo contendere (no contest)☐
        (2) Guilty      ☐                    (4) Insanity plea              ☐

     (b) If you entered a guilty plea to one count or charge and a not guilty plea to
     another count or charge, what did you plead guilty to and what did you plead not
     guilty to? NA

*N/P*

(c) If you went to trial, what kind of trial did you have? (Check one)
Jury   ☒

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?
Yes ☒     No ☐

8. Did you appeal from the judgment of conviction?
Yes ☒     No ☐

9. If you did appeal, answer the following:
 (a) Name of court: Florida Supreme Court
 (b) Docket or case number (if you know): SC 94,487
 (c) Result: Affirmed
 (d) Date of result (if you know): October 12, 2000.
 (e) Citation to the case (if you know): 775 So.2d 923 (Fla. 2000)
 (f) Grounds raised:
  (1) the admission of testimony relating to the death of infant Skipper Lee Good;
  (2) Sexton's request for new counsel;
  (3) admission of victim impact testimony;
  (4) sufficiency of the evidence; and
  (5) several penalty phase issues including weighing of the sentencing factors, proportionality, and the claim that Florida's capital sentencing scheme is unconstitutional.
 (g) Did you seek further review by a higher state court? Yes ☐ No ☒
 (h) Did you file a petition for certiorari in the United States Supreme Court?
  Yes ☐   No ☒

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?
  Yes ☒     No ☐

11. If your answer to Question 10 was "Yes," give the following information:
 (a) (1) Name of court: the Circuit Court of the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida
  (2) Docket or case number (if you know): 94-1299
  (3) Date of filing (if you know): January 18, 2002.
  (4) Nature of the proceeding: State Motion for Post-conviction Relief (Fla.R.Crim.P. 3.851)
  (5) Grounds raised:

(a) ineffective assistance during the guilt phase by failing to conduct an adequate voir dire and failing to object to evidence during the State's case;
(b) ineffective assistance during the penalty phase by failing to adequately investigate mitigation, provide mental health experts with mitigating evidence, and adequately challenge the State's case;
(c) death sentence is unconstitutional because the penalty phase jury instructions were erroneous and shifted the burden to the defense to prove that death was inappropriate, and counsel was ineffective for failing to object on this basis;
(d) Florida's statute is unconstitutional because it fails to prevent the arbitrary and capricious application of the death penalty and counsel was ineffective for failing to raise this issue;
(e) denial of effective assistance of postconviction counsel because of the rules prohibiting juror interviews;
(f) execution by lethal injection constitutes cruel and unusual punishment;
(g) the death penalty statute is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000);
(h) cumulative error; and
(i) Sexton's Eighth Amendment rights may be violated because he may be incompetent at the time of his execution.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?      Yes   ☒              No   ☐
(7) Result: The trial court heard evidence on claim 2, ineffective assistance during the penalty phase, and denied relief on all claims.
(8) Date of result (if you know): January 30, 2007.

(b) If you filed any second petition, application, or motion, give the same information:   NA
(c) If you filed any third petition, application, or motion, give the same information:   NA
(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion? Yes
If you did appeal, answer the following:
(i)      Name of court: Florida Supreme Court
(ii)     Docket or case number (if you know): SC07-286.
(iii)    Result: Affirmed
(iv)     Date of result (if you know): September 18, 2008.
(v)      Citation to the case (if you know): 997 So.2d 1073 (Fla. 2008)
(vi)     Grounds raised:

3

(1) The postconviction court erred in denying the claim that trial counsel were prejudicially ineffective in the penalty phase because they failed to adequately investigate and prepare mitigating evidence, failed to provide the mental health experts with this mitigation, and failed to adequately challenge the state's case.

(2) The trial court erred in denying guilt phase claims without an evidentiary hearing.

(3) The trial court erred in denying the claim that appellant's conviction is materially unreliable due to the cumulative effects of ineffective assistance of counsel and improper rulings of the trial court.

(4) The trial court erred in denying his claim that appellant is denied his rights under the first, sixth, eighth, and fourteenth amendments to the united states constitution and the corresponding provisions of the florida constitution and is denied effective assistance of counsel in pursuing his postconviction remedies because of the rules prohibiting appellant's lawyers from interviewing jurors to determine if constitutional error was present.

(5) Execution by lethal injection is cruel and/or unusual punishment and violates appellant's rights under the eighth and fourteenth.

(6) Appellant's eighth amendment right against cruel and unusual punishment will be violated as appellant may be incompetent at time of execution.

(e)     Did you seek further review by a higher state court? Yes ☐ No ☒

(f)     Did you file a petition for certiorari in the United States Supreme Court? Yes    ☐      No ☒

(g)     If you did not appeal to the highest state court having jurisdiction, explain why you did not: NA

12.     For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND 1**

THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE
TESTIMONY RELATING TO THE DEATH OF THE INFANT,
SKIPPER LEE GOOD, WHERE THE ADMISSION OF THIS
EVIDENCE WAS NOT RELEVANT AND THE  PREJUDICIAL
IMPACT FAR OUTWEIGHED THE PROBATIVE VALUE.

(a).    Supporting facts:        The State presented evidence from Willie Sexton, Matthew
Sexton, and Pixie Good about the death of Pixie and Joel Good's infant son, Skipper Lee
Good.

According to Willie, he heard the baby crying one evening. The baby had been
sick, but Mr. Sexton had not let Pixie take him to the doctor. (Vol.VI,T431). Mr. Sexton
told Pixie to stop the crying or they could get caught. (Vol.I,T428).   Willie said he heard
Mr. Sexton tell Pixie to smother the baby, and Pixie asked how.  Mr. Sexton told Pixie to
put her hand over the mouth and nose and hold it.  Pixie did this, the baby stopped crying,
and the next morning he was dead. (Vol.VI,T430).  Willie believed Joel Good was asleep
during the incident.  (Vol.VI,T432).  Willie testified that Mr. Sexton then wanted Joel to
be "put to sleep" so he couldn't go to his grandparents and tell them about the baby being
dead. (Vol.VI,T441).

Matthew Sexton testified that he saw Pixie smother the baby. (Vol. VII,T507).
Matthew heard Mr. Sexton tell Pixie to quiet the baby, but Matthew did not think he told
her to kill him. (Vol. VII,T507).  Mr. Sexton was upset about the baby's death. (Vol.VII,
T512).  Matthew thought Mr. Sexton was afraid Joel would run off because the baby was
dead and because Joel was "broke down" or mad.  (Vol.VII,T510).

5

Pixie Sexton testified that her infant son was ill while they were in the camp ground. (Vol.VII,T569). She couldn't get him to stop crying and Mr. Sexton expressed concern that the crying drew attention to the family. (Vol.VII,T569). Mr. Sexton told Pixie to give the child Nyquil. (Vol.VII,T569). One night the baby woke up and wouldn't quiet down. Mr. Sexton told Pixie to quiet the child or he would come back there and do it himself. (Vol.VII,T569). Pixie put her hand over the baby's mouth and he quieted down. The next morning he was dead. (Vol. VII, T570). Mr. Sexton said the child died from crib death. (Vol.VII,T570).

Joel was upset and wanted to go back to Ohio for burial of the baby. (Vol.VII,T571). Pixie believed Joel had wanted to return to Ohio before the baby's death as well. (Vol.VII, T575). According to Pixie Sexton, Mr. Sexton wanted to kill Joel because he knew too much and wanted to go to Ohio concerning the baby. (Vol.VII,T560). Mr. Sexton did not want anyone to know where he was. (Vol.VII,T559). Pixie didn't know if Mr. Sexton was worried about being arrested for the death of the baby, but he had told her that she would be arrested. (Vol.VII,T588). Pixie denied being told by Mr. Sexton to smother the baby. (Vol.VII,T589). Mr. Sexton did not show her how to smother it. (Vol.V11,T589).

At the first trial, the defense had suggested Pixie had directed Willie to kill Joel, but the defense was viable only because Willie Sexton did not testify. The State was allowed to submit evidence of the baby's death and Mr. Sexton's incestuous relationship with Pixie to explain why Mr. Sexton perceived Joel as a threat who needed to be

6

eliminated, to overcome the suggestion that Pixie directed the murder. At the retrial,

Willie testified he killed at Mr. Sexton's direction, and the defense strategy of throwing

blame on Pixie was mooted. Thus, there was no longer a need for the State to overcome

the suggestion of Pixie's culpability by showing how the infant's death motivated Mr.

Sexton to eliminate Joel Good.

(b)    If you did not exhaust your state remedies on this Ground, explain why: NA

(c)    Direct Appeal of this Ground:

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes   ☒            No   ☐

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: NA

(d)    Post-Conviction Proceedings:

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        Yes   ☐            No   ☒

    (2) If your answer to Question (d) (1) is "Yes," state: NA

    (3) Did you receive a hearing on your motion or petition? NA

        Yes   ☐            No   ☐

    (4) Did you appeal from the denial of your motion or petition? NA

        Yes   ☐            No   ☐

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? NA

        Yes   ☐            No   ☐

    (6) If your answer to Question (d) (4) is "Yes," state: NA

    (7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue: NA

(e)    Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on this Ground: NA

## GROUND 2

THE TRIAL COURT ERRED IN FAILING TO ADEQUATELY
ADDRESS MR. SEXTON'S REQUEST FOR NEW COUNSEL WHEN
MR. SEXTON RAISED QUESTIONS REGARDING THE
EFFECTIVENESS OF COUNSEL'S REPRESENTATION.

(a)     Supporting facts:     On August 24, 1998, Mr. Sexton presented the court with a

letter requesting that he be appointed different counsel because he no longer had

confidence in current counsels' ability to represent him.  Mr. Sexton claimed his lawyers

had not talked to some witnesses and that they did not want to present some witnesses for

strategic reasons.  Mr. Sexton said he had talked to another lawyer who had said that what

his lawyers were doing sounded very inexperienced. (Vol. SR3-4).

      The court advised Mr. Sexton he was not entitled to different counsel, but that he

could represent himself.  Mr. Sexton stated that he didn't have the ability to represent

himself.  Mr. Sexton told the court that this was not the first request he had made – he had

requested different attorneys from a different judge.  The trial judge told Mr. Sexton that

most defendants have good and bad days with their attorneys, but Mr. Sexton wasn't

entitled to different counsel.  The court then asked counsel if they had anything to say and

they declined. (Vol.XII,T1097-99).

      The court did not make sufficient inquiry into the reasons why Mr. Sexton had no

confidence in the abilities of his attorneys. A feeling of "no confidence" when coupled

with the statement in the letter that Mr. Sexton had consulted another attorney who felt

that performance may be deficient was clearly a complaint about the ineffectiveness of

counsel.  The trial court should have conducted a more thorough inquiry into the reasons

why Mr. Sexton felt counsel was ineffective.  Instead, the trial court treated the complaint

as more of a personality conflict.  The trial court should also have questioned defense

counsel specifically about the allegations in the letter rather than allowing them to simply

state they had no comment. Any subsequent findings from this inquiry should have

appeared in the record.   Because of the inadequate inquiry by the trial court into Mr.

Sexton's request, relief is required.

(b)     If you did not exhaust your state remedies on this Ground, explain why: NA
(c)     Direct Appeal of this Ground:
      (1) If you appealed from the judgment of conviction, did you raise this issue?
          Yes     ☒                          No       ☐
      (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: NA
(d)     Post-Conviction Proceedings:
      (1) Did you raise this issue through a post-conviction motion or petition for
      habeas corpus in a state trial court?
          Yes     ☐                          No       ☒
      (2) If your answer to Question (d) (1) is "Yes," state: NA
      (3) Did you receive a hearing on your motion or petition? NA
          Yes     ☐                          No       ☐
      (4) Did you appeal from the denial of your motion or petition? NA
          Yes     ☐                          No       ☐
      (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the
      appeal? NA
          Yes     ☐                          No       ☐
      (6) If your answer to Question (d) (4) is "Yes," state: NA
      (7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why
      you did not raise this issue: NA
(e)     Other Remedies: Describe any other procedures (such as habeas corpus,
      administrative remedies, etc.)  that you have used to exhaust your state remedies
      on this Ground: NA

## GROUND 3

THE TRIAL COURT ERRED IN ADMITTING VICTIM IMPACT
EVIDENCE WHEN THE CONTENT OF THAT EVIDENCE
VIOLATED DUE PROCESS GUARANTEES OF BOTH THE
FEDERAL AND FLORIDA CONSTITUTIONS.

(a)     Supporting facts:      Victim impact evidence is admissible in Florida:

the evidence shall be designed to demonstrate the victim's uniqueness as
an individual human being and the resultant loss to the community's

9

     members by the victim's death. Characterizations and opinions about the
     crime, the defendant, and the appropriate sentence shall not be permitted
     as a part of the victim impact evidence.

Section 921.141(7), Florida Statutes (1996).

   Defense counsel in this case made his concerns known to the trial court regarding

the potential for harm in the admission of the victim impact in this case. Motions were

filed to limit the number of witnesses, to seek pretrial determinations on admissibility,

and to video tape the presentation of the evidence to provide better appellate review of

this highly emotional and particularized evidence. (Vol.I,R107-132) The court's denial of

the request to videotape this testimony was error. Improper victim impact evidence was

presented to the jury, resulting in further reversible error.

   Prior to the trial, the family members of Joel Good submitted written statements

to the trial court. Some items were stricken, then each family member read his or her

statement to the jury. (Vol.XII, T881-882)

   Teresa Boron, Joel Good's aunt, testified that the deceased baby, Skipper Good,

was a beautiful baby. She gave Skipper her children's baby clothes. As to Joel, she stated

the following. Joel was on cloud nine with the child. Joel always wanted to be a father

and have a family. Joel would have made up with Skipper for the time he missed out

with his own father. He (Joel) took his one and only airplane ride in a sealed vault with

his baby son cradled in his arms. If Joel was alive today he would be raising his son away

from the sickness of his wife's family. Joel's brother, Danny, will never get to play catch

with the only nephew he will ever have because Skipper's life was also taken in a

10

senseless act of violence. (Vol. XII,T892-94).

Following Mrs. Boron's testimony, the court denied a motion for mistrial made on the ground that her testimony was not appropriate victim impact evidence and that two of the jurors cried during her testimony and a couple of others appeared about to cry. Asby Barrick, Joel's uncle, then testified that when Skipper was born, Joel finally had a family of his own, something he wanted all his life. (Vol.XII,T895-98)

Mrs. Boron called the killings of Joel and Skipper Good "senseless." Pixie's family was "sick." Joel's death was called "tragic and unnecessary." (Vol.XII, T891-94). The testimony was dominated by references to the child, the effects of the child's death on the surviving family, and supposition of how the child's death affected Joel Good.

The evidence was irrelevant. The prejudicial impact outweighed any probative value and infected the fundamental fairness of the sentencing proceeding.

The defense requested permission to videotape the victim impact testimony. The court initially granted the motion but later denied it. This violated Mr. Sexton's right to federal due process, to preserve the true nature of the evidence for proper review by the appellate court. Had the testimony been preserved on tape, the full prejudicial impact of the testimony would have been readily apparent to the Florida Supreme Court, compelling them to order a new penalty phase trial. Instead, the cold record allowed the profound negative impact of the testimony to be ignored or devalued.

(b)     If you did not exhaust your state remedies on this Ground, explain why: NA

(c)     Direct Appeal of this Ground:

11

(1)  If you appealed from the judgment of conviction, did you raise this issue?

     Yes    ☒                      No    ☐

(2)  If you did <u>not</u> raise this issue in your direct appeal, explain why: NA

(d)     Post-Conviction Proceedings:
(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
     Yes    ☐                      No    ☒

(2)  If your answer to Question (d) (1) is "Yes," state: NA
(3)  Did you receive a hearing on your motion or petition? NA
     Yes    ☐                 No    ☐
(4)  Did you appeal from the denial of your motion or petition? NA
     Yes    ☐                 No    ☐
(5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? NA
     Yes    ☐                 No    ☐
(6)  If your answer to Question (d) (4) is "Yes," state: NA
(7)  If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue: NA

(e)     Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on this Ground: NA

## GROUND 4

THE SENTENCE OF DEATH IS DISPROPORTIONATE BECAUSE THIS IS NOT THE MOST AGGRAVATED AND LEAST MITIGATED OF CASES.

(a)     Supporting facts:     This case is certainly not among the most aggravated

murder cases in Florida. While the trial court found three aggravating factors -- prior

violent felony, cold-calculated-premeditated (CCP), and murder to avoid arrest or

detection, there was also substantial mitigation. Although three aggravators were found

12

and these are ones which are at times given great weight, they were not of such a weight that no amount of mitigation could overcome them. One aggravator, the prior violent felony conviction, was appropriately given little weight by the trial judge. This aggravator stemmed from a conviction in 1965 for robbery. Given the age of the prior conviction and the little weight afforded to it by the trial court, this is essentially becomes a two aggravator case -- CCP and a homicide committed to avoid arrest or detection.

The CCP aggravator in this case is closely linked to the statutory mitigator regarding Mr. Sexton's mental health. According to the defense testimony, a significant feature of Mr. Sexton's mental illness was his inability to plan or premeditate; instead, Mr. Sexton would obsess. In this case this aggravator should not be considered as severe when compared to those cases where a murder is meticulously planned and carried out.

In mitigation, the court found that statutory mental health mitigator was established and assigned it great weight. A list of six other mitigating factors were found and some weight was assigned to each of those. Mental health mitigation has also always been of the weightiest counterbalances to aggravation.

The fact that two other persons culpable in this murder, Willie Sexton and Pixie Good, did not receive a death penalty also compels a conclusion that death is disproportionate for Mr. Sexton. According to the testimony presented at penalty phase, Mr. Sexton functioned at a low-normal intelligence level, had an inability to appreciate the emotional significance of reality, exhibited many bizarre thought processes, and suffered clinically demonstrable brain dysfunction. This was not a situation where a

13

significantly more capable person exercised control over another individual with lesser abilities. Willie and Mr. Sexton were not markedly different in their ability to function appropriately.

Willie, admittedly the actual killer, received a sentence of 25 years in prison. Mr. Sexton received a death sentence. Although Mr. Sexton did exert influence over Willie, it was also testified that anyone could influence him, and Pixie was also urging Willie to kill Joel.

It is entirely likely that Pixie was also an equally strong force behind this homicide. She, however, was not charged in this offense by virtue of a plea bargain she entered into with the State. In exchange for her testimony she was allowed to plead to manslaughter in the death of her child. At the time of the retrial, she had already been released from prison. A life sentence in this case would still punish Mr. Sexton far more severely than either Willie or Pixie, yet would not be disproportionate. The totality of the circumstances in this case warrant a sentence of life imprisonment.

(b)     If you did not exhaust your state remedies on this Ground, explain why: NA

(c)     Direct Appeal of this Ground:

     (1) If you appealed from the judgment of conviction, did you raise this issue?
         Yes   ☒               No   ☐

     (2) If you did not raise this issue in your direct appeal, explain why: NA

(d)     Post-Conviction Proceedings:

     (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
         Yes   ☐               No   ☒

     (2) If your answer to Question (d)(1) is "Yes," state: NA

     (3) Did you receive a hearing on your motion or petition? NA
         Yes   ☐               No   ☐

     (4) Did you appeal from the denial of your motion or petition? NA

Yes   ☐                    No    ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? NA

Yes   ☐                    No    ☐

(6) If your answer to Question (d) (4) is "Yes," state: NA

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue: NA

(e)   Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on this Ground: NA

## GROUND 5

**THE PROVISION OF FLORIDA'S DEATH PENALTY STATUTE WHICH ALLOWED A DEATH RECOMMENDATION AGAINST MR. SEXTON TO BE RETURNED BY A BARE MAJORITY VOTE VIOLATES THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

(a)   Supporting facts:        The Sixth, Eighth, or Fourteenth Amendments require jury

unanimity (or at least a substantial majority). A Florida penalty jury's role is not merely

advisory, it is the co-sentencer, and the old excuse that the jury is merely recommending a

sentence cannot prevail.

Florida's sentencing scheme further violates constitutional guarantees because of

its failure to require unanimity or even a substantial majority to find a particular

aggravating circumstance, or that any aggravating circumstance exists. Under Florida

law, aggravating circumstances substantively define those capital felonies for which the

death penalty may be imposed. Aggravating circumstances function as essential

elements, in the absence of which a death recommendation cannot lawfully be made.

Because neither unanimity nor a substantial majority is required to find an aggravating circumstance or recommend the death penalty, the Florida procedure allows a death recommendation even if five of the twelve jurors find no aggravating factors proven, as long as the other seven jurors find one or more aggravators and conclude that these were not outweighed by the mitigating factors. The seven jurors voting for death could each find a different aggravating factor, while five found no aggravators at all, as long as each of the seven determined that his or her aggravator was not outweighed by mitigators. Thus, a death recommendation would be possible under Florida's procedure even if each aggravator was rejected by eleven out of the twelve jurors.

When the State convinces only a bare majority of jurors that death is the appropriate sentence, a sole juror could effectively make the difference between whether the defendant lives of dies. Such a result makes Florida's death penalty scheme arbitrary and capricious.  Mr. Sexton's 8 to 4 death recommendation falls squarely within the class of jury verdicts which cannot be sustained in light of the protection of the Sixth, Eighth, or Fourteenth Amendments.

(b)    If you did not exhaust your state remedies on this Ground, explain why: NA

(c)    Direct Appeal of this Ground:

       (1) If you appealed from the judgment of conviction, did you raise this issue?

          Yes   x              No   ☐

       (2) If you did not raise this issue in your direct appeal, explain why: NA

(d)    Post-Conviction Proceedings:

       (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

          Yes   ☐              No   X

       (2) If your answer to Question (d)(1) is "Yes," state: NA

       Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition? NA

      Yes    ☐                 No     ☐

(4) Did you appeal from the denial of your motion or petition?  NA

      Yes    ☐                 No     ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? NA

      Yes    ☐                 No     ☐

(6) If your answer to Question (d)(4) is "Yes," state: NA

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)       Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on this Ground: NA

## GROUND 6

**THE POSTCONVICTION COURT ERRED IN DENYING THE CLAIM THAT TRIAL COUNSEL WERE PREJUDICIALLY INEFFECTIVE IN THE PENALTY PHASE BECAUSE THEY FAILED TO ADEQUATELY INVESTIGATE AND PREPARE MITIGATING EVIDENCE, FAILED TO PROVIDE THE MENTAL HEALTH EXPERTS WITH THIS MITIGATION, AND FAILED TO ADEQUATELY CHALLENGE THE STATE'S CASE.**

(a)     Supporting facts:       Where the changed votes of only two of the jurors would have made the sentencing recommendation for life instead of death, the contrast between the efforts defense counsel made in developing and presenting statutory and nonstatutory mitigation is simply striking. The trial court found one statutory mitigator, that Sexton was under an extreme mental or emotional disturbance at the time the murder was committed,

17

and gave this mitigator great weight. The trial court found and gave some weight to the "several" nonstatutory mitigators presented by defense counsel: (1) Sexton was capable of kindness to children and would even act as Santa Claus at Christmas; (2) Sexton was the pastor of a church attended by family and friends; (3) Sexton at times had a normal, loving relationship with his children; (4) Sexton often helped his mother and sisters with household chores and repairs; (5) Sexton's father died when the defendant was ten years old, depriving him of a male role model; and (6) the codefendant, Willie, received a lesser sentence of twenty-five years' imprisonment. (PCR Vol. 1 p. 42).[1]

Trial counsel addressed his 1998 tactical and strategic reasoning for presenting such a sparse record and argument at the evidentiary hearing:

> "[G]enerally, back then I was much more conservative in what I would serve up to a jury than I am now. I have come to the conclusion over the last several of these that you just throw everything into the pot. Back then I was trying to use a rifle as opposed to a shotgun, more so than now..." (PCR Vol. 18 pp. 228-229).

> "The theory of defense is that the PET scan conclusively showed that several portions of his brain were not functioning." (PCR Vol. 18 pp. 180-181).

> "I remember thinking there isn't much in terms of his childhood for a couple of reasons, and I think I got the idea from Nellie Hampf, that his childhood

---

[1]

In the defendant's first trial in 1994, the trial court found the same aggravating factors and, in mitigation, that defendant was under emotional strain due to the efforts of Ohio officials to take custody of his children; that he acted in a peculiar fashion at times; that he demonstrated some human qualities; that he played Santa Claus on at least one occasion and appeared to some as normal; and that letters from family members described defendant as kind, respectful, and helpful. The court found that the evidence did not support the claim that Sexton was disabled and dependent on pain medication. Sexton v. State, 697 So.2d 833, 835-836 (Fla. 1997).

was normal, happy, all of that, that was at least one person I got the information from, and then the fact that Eddie was older seemed to strain the connection between childhood trauma, problems and so forth and his behavior 40 odd years later. So I hope that answered the question." (PCR Vol. 18 p. 165).

"If I don't think a factor has a persuasive value, then I'm not going to clutter up the record. I'm not going to clutter up the jury's perception throwing in a lot of extraneous garbage that doesn't have any probative value." (PCR Vol. 18 p. 166).

"Absolutely meaningless." (answering a question on cross as to his view of whether evidence of the defendant's blindness in one eye and diabetes may have been persuasive in light of the abusive conduct evidence admitted at trial). (PCR Vol. 18 p. 227).

The reality is that counsel's "rifle" approach missed the mark of proper, and therefore, reasonable, handling of penalty phases in capital cases – in 1998 if not also in 1994  With the "rifle" approach, Mr. Fraser never made any reasonable tactical or strategic choices in 1998 about what to give to the jury or about limiting the type or amount of nonstatutory mitigation. By his own explanation, he never "threw everything into the pot" until making "the conclusion [to do so] over the last several of these [death penalty cases as a defense lawyer]."   His approach went against prevailing standards and provided unreasonable and ineffective assistance of counsel.

If counsel had used the "shotgun" approach in 1998, additional and compelling mitigation could have been presented to the jury charged with the responsibility of recommending whether Mr. Sexton would be sentenced to life or death. For example, at the evidentiary hearing, Dr. Stein, the State's expert, agreed with Dr. McCraney that Sexton had:

1.      a family history of mental disorders;

19

2.      a family history of possible mental retardation;

3.      a limited education; (PCR Vol. 18 pp. 288);

4.      a family history of possible learning disabilities;

5.      multiple sclerosis[2] (PCR Vol. 18 p. 289).

She also testified that the neuropsychological testing done at trial was not adequate. (PCR

Vol. 18 pp. 289-290). She similarly stated that she diagnosed antisocial personality disorder

but explained that ASPD is something that develops in late adolescence and early adulthood;

while the exact causes are unknown, psychiatrists believe from research that there are

---

[2]

As described by the National Institute of Neurological Disorders and Stroke (an institute of the National Institutes of Health):

> Multiple sclerosis is an unpredictable disease of the central nervous system. It can range from relatively benign to somewhat disabling to devastating, as communication between the brain and other parts of the body is disrupted.... Most people experience their first symptoms of MS between the ages of 20 and 40; the initial symptom of MS is often blurred or double vision, red-green color distortion, or even blindness in one eye. Most MS patients experience muscle weakness in their extremities and difficulty with coordination and balance.  These symptoms may be severe enough to impair walking or even standing.  In the worst cases, MS can produce partial or complete paralysis.  Most people with MS also exhibit paresthesias, transitory abnormal sensory feelings such as numbness, prickling, or 'pins and needles' sensations.  Some may also experience pain.  Speech impediments, tremors, and dizziness are other frequent complaints.  Occasionally, people with MS have hearing loss. Approximately half of all people with MS experience cognitive impairments such as difficulties with concentration, attention, memory, and poor judgment, but such symptoms are usually mild and are frequently overlooked.  Depression is another common feature of MS. ... There is no cure for MS.

> http://www.ninds.nih.gov/disorders/multiple_sclerosis.htm

20

biological, genetic, psychological and psychosocial or environmental type influences and she

agreed that no one chooses to be antisocial or to acquire those traits – that the traits of ASPD

are something that someone has whether they want them or not.  (PCR Vol. 18 p. 290).

If counsel had used the "shotgun" approach in 1998, he could also have told the jury

about his client's early childhood background in impoverished conditions ; his client's

disadvantaged or deprived childhood; his client's educational difficulties; his client's

utilization of alcohol and drugs; and his client's good behavior during trial. The details for

the pre-trial mitigation listed here were provided and confirmed by Otis Sexton (PCR Vol.

3 pp. 532-535) as well as Jan Vogelsang's descriptions of the effect of the risk factors

petitioner faced as a child (PCR Vol. 19 pp. 337-338).

(b)      If you did not exhaust your state remedies on this Ground, explain why: NA
(c)      Direct Appeal of this Ground:
         (1) If you appealed from the judgment of conviction, did you raise this issue?
               Yes    □                          No      X
         (2) If you did not raise this issue in your direct appeal, explain why: PC CLAIM
(d)      Post-Conviction Proceedings:
         (1) Did you raise this issue through a post-conviction motion or petition for habeas
         corpus in a state trial court?
               Yes    X                          No      □
         (2) If your answer to Question (d)(1) is "Yes," state:
(a)      (1) Name of court: the Circuit Court of the Thirteenth Judicial Circuit, in and
         for Hillsborough County, Florida
         (2) Docket or case number (if you know):  94-1299
         (3) Date of filing (if you know): January 18, 2002.
         (4) Nature of the proceeding: State Motion for Post-conviction Relief
         (Fla.R.Crim.P. 3.851)
         (4) Did you appeal from the denial of your motion or petition?
               Yes    X                          No      □
         If you did appeal, answer the following:
(i)      Name of court: Florida Supreme Court
(ii)     Docket or case number (if you know): SC07-286.

21

(iii)    Result: Affirmed
(iv)    Date of result (if you know): September 18, 2008.
(v)    Citation to the case (if you know): 997 So.2d 1073 (Fla. 2008)

(e)    Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on this Ground: NA

### GROUND 7

THE TRIAL COURT ERRED IN DENYING GUILT PHASE CLAIMS WITHOUT AN EVIDENTIARY HEARING.

(a)    Supporting facts:      In the proceeding below, the postconviction trial court wrongfully denied the guilt phase claims in petitioner's Rule 3.851 motion without an evidentiary hearing and without opportunity for argument or appeal.  The petitioner's initial postconviction motion was filed on January 18, 2002.  (PCR Vol. 1 pp. 82-111).  It was amended on March 21, 2002.  (PCR Vol. 1 pp. 45-98).  Claim 1, which contained the guilt phase ineffective assistance of counsel claims, was identified by the petitioner, pursuant to Fla.R.Crim.P. 3.851(f)(5)(A)(I), as appropriate for an evidentiary hearing.  (PCR Vol. 1 p. 53).  The court conducted the Case Management Conference on February 21, 2003.  (PCR Vol. 17 pp. T30-T59).  At that conference, the petitioner repeatedly referred the court to the motion and to his request for an evidentiary hearing for Claim 1.  (PCR Vol. 17 pp. 33; 43; 47; 49; 53; 56).

The State itself agreed with the petitioner and informed the court that the legal claims, requiring no hearing, were claims 3 through 9 with the exception of the cumulative error claim.  (PCR Vol. 17 pp. 37).  The State later verbally summarized its written responses to claims 1 and 2 for the court.  (PCR Vol. 17 pp. 38-40).  At the hearing, the court summarily

22

denied claims 3 through 9 with the exception of 8 and took under advisement claims 1, 2 and 8. (PCR Vol. 17 p. 57).

Without further hearing and without allowing appeal, the court's order of March 11, 2003, included a denial of claim 1 guilt phases issues. That order, and the order issued on March 13, 2003, granted an evidentiary hearing for penalty phase issues contained in claims 2 and 8 of the motion.   (PCR Vol. 2 pp. 201-231; PCR Vol. 3 pp. 410-411).

On direct appeal, the Florida Supreme Court noted that the petitioner presented no defense during the guilt phase of the trial at the conclusion of the State's case – in contrast to the conduct of the first trial. Sexton, 775 So.2d at 929. As quoted by the postconviction court in its March 11, 2003, order, defense counsel told the jury during opening statements:

> You're going to learn very quickly in this trial, if you haven't already, that Eddie Sexton is a far cry from the all American father. You're going to hear evidence that he engaged in conduct before he was arrested in this case with his children that could be considered reprehensible. You're going to learn that he took liberties with his children that may ask you - - or may cause you to ask yourselves and wonder, can this kind of thing really happen; does this really go on. I'm here to tell you that the evidence will show that in the Sexton family this did go on.   (record citation omitted).

(PCR Vol. 2, p.207).

Within this context, petitioner sought an evidentiary hearing for the guilt phase of the trial to determine the material facts, at minimum, concerning what possible defense theory or tactical reasons caused counsel to:

1.     fail to object to the State's reference to his "able" investigator thereby advancing the State's own opinion as to that witnesses credibility;

2.     fail to object about certain venire members walking in and out

23

of the courtroom during jury selection;

     3.     fail to object when the State introduced a religious reference by thanking God that the lawyers were not on trial;

     4.     fail to request individual voir dire after four venire members indicated they had heard details of the case;

     5.     fail to object to the State referencing the expected testimony regarding sexual abuse by the defendant towards and his son, Willie;

     6.     concede to the sexual abuse and unusual family relationships in the Sexton family, thereby bolstering that competent of the State's case instead of challenging it;

     7.     fail to object or require the State to make a foundation in the State's introduction of testimony from the Ohio social worker about the defendant fathering two of his daughter's children;

     8.     fail to object to the speculation requested of how Willie felt, and fail to object to numerous hearsay statements regarding a variety of third party conversations;

     9.     fail to object to a statement from daughter Pixie about a threat from the defendant that was covered by the previous motion in limine;

     10.     fail to object to the State's introduction of the video tape addressed to President Clinton; and

     11.     fail to object to the State's disparaging remarks about counsel during the State's closing.

(PCR Vol. 1 pp. 51-53).

(b)     If you did not exhaust your state remedies on this Ground, explain why: NA
(c)     Direct Appeal of this Ground:
     (1) If you appealed from the judgment of conviction, did you raise this issue?
          Yes    ☐             No    X
     (2) If you did not raise this issue in your direct appeal, explain why: PC CLAIM
(d)     Post-Conviction Proceedings:
     (1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court?

      Yes   X              No    □

(2) If your answer to Question (d)(1) is "Yes," state:

(a)     (1) Name of court: the Circuit Court of the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida

           (2) Docket or case number (if you know):  94-1299

           (3) Date of filing (if you know): January 18, 2002.

           (4) Nature of the proceeding: State Motion for Post-conviction Relief (Fla.R.Crim.P. 3.851)

(4) Did you appeal from the denial of your motion or petition?

      Yes   X              No    □

If you did appeal, answer the following:

(i)     Name of court: Florida Supreme Court

(ii)    Docket or case number (if you know): SC07-286.

(iii)   Result: Affirmed

(iv)   Date of result (if you know): September 18, 2008.

(v)    Citation to the case (if you know): 997 So.2d 1073 (Fla. 2008)

(e)    Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on this Ground: NA

## GROUND 8

**THE TRIAL COURT ERRED IN DENYING THE CLAIM THAT Petitioner'S CONVICTION IS MATERIALLY UNRELIABLE DUE TO THE CUMULATIVE EFFECTS OF INEFFECTIVE ASSISTANCE OF COUNSEL AND IMPROPER RULINGS OF THE TRIAL COURT.**

(a)    Supporting facts:    The claim that petitioner's conviction is materially unreliable because no adversarial testing occurred due to the cumulative effects of ineffective assistance of counsel and improper rulings of the trial court, in violation of petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments, was denied because the court had denied relief in all the other claims in the postconviction motion. (PCR Vol. 4 p. 786).    Under different circumstances, the cumulative effects claim can make for an

appropriate summation of all the errors presented in a trial record and postconviction proceeding. However, with the court limiting the evidentiary hearing to the one claim involving the penalty phase of the retrial, the petitioner has not been able to establish a guilt phase record of trial counsels' shortcomings or their legal consequences.

However, the Florida Supreme Court's opinion on direct appeal noted two separate deficiencies of trial counsel that are part of the record of this case and which are not affected by the limited evidentiary hearing. Those deficiencies were recognized as the Court addressed the issues raised by the defendant's direct appeal counsel. First, the Court found procedurally barred the claim of error of admitting into evidence testimony relating to the death of the infant, Skipper Lee Good, because counsel did not object to the admission of this testimony. The Court, however, further reviewed the claim, even though it was not preserved, and rejected it on the merits. Sexton, 775 So.2d at 929-930.

Secondly, the Court found procedurally barred the claim of error to admit victim impact testimony that erroneously focused on the death of Joel Good's deceased infant and the witnesses' opinions of the killings because trial counsel failed to make a contemporaneous objection. The Court subsequently found that this was not fundamental error. Sexton, 775 So.2d at 931-932. Combined with the shortcomings of counsel and prejudice to defendant as outlined above in Argument I, these deficiencies should cumulatively lead to relief for the petitioner because, even if not one single act or omission is deemed sufficient to warrant relief, the cumulative effect of two or more of them may do so.

26

(b)     If you did not exhaust your state remedies on this Ground, explain why: NA

(c)     Direct Appeal of this Ground:

      (1) If you appealed from the judgment of conviction, did you raise this issue?

          Yes    □               No     X

      (2) If you did not raise this issue in your direct appeal, explain why: PC CLAIM

(d)     Post-Conviction Proceedings:

      (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

          Yes    X              No    □

      (2) If your answer to Question (d)(1) is "Yes," state:

(a)     (1) Name of court: the Circuit Court of the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida

        (2) Docket or case number (if you know): 94-1299

        (3) Date of filing (if you know): January 18, 2002.

        (4) Nature of the proceeding: State Motion for Post-conviction Relief (Fla.R.Crim.P. 3.851)

      (4) Did you appeal from the denial of your motion or petition?

          Yes    X              No    □

      If you did appeal, answer the following:

      (i)      Name of court: Florida Supreme Court

      (ii)     Docket or case number (if you know): SC07-286.

      (iii)    Result: Affirmed

      (iv)    Date of result (if you know): September 18, 2008.

      (v)     Citation to the case (if you know): 997 So.2d 1073 (Fla. 2008)

(e)     Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on this Ground: NA

### GROUND 9

THE TRIAL COURT ERRED IN DENYING HIS CLAIM THAT Petitioner IS DENIED HIS RIGHTS UNDER THE FIRST, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION AND IS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN PURSUING HIS POSTCONVICTION REMEDIES BECAUSE OF THE RULES PROHIBITING Petitioner'S LAWYERS FROM INTERVIEWING JURORS TO DETERMINE IF CONSTITUTIONAL ERROR WAS PRESENT.

(a)    Supporting facts:    The state postconviction court denied the claim based on a procedural bar for failure to raise it on direct appeal and, alternatively, on Florida case law prohibiting such interviews.  (PCR Vol. 4 pp. 783-784; PCR Vol. 2 pp. 228-229).  Petitioner argued that he is denied his rights under the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Florida Constitution and is denied effective assistance of counsel in pursuing his postconviction remedies because of the rules prohibiting petitioner's lawyers from interviewing jurors to determine if constitutional error was present.

The thrust of the petitioner's argument is that Florida's restrictions on post-trial juror interviews are an equal protection violation.  Criminal defense counsel in Florida are treated differently, unfairly and unequally compared to academics, journalists and those lawyers not connected with a particular case.  Academics, journalists and those lawyers not connected with a particular case are not subject to the restrictions and are free to interview willing jurors.

(b)    If you did not exhaust your state remedies on this Ground, explain why: NA

(c)    Direct Appeal of this Ground:

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes   ☐            No   X

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: PC CLAIM

(d)    Post-Conviction Proceedings:

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        Yes   X            No   ☐

    (2) If your answer to Question (d)(1) is "Yes," state:

(a)    (1) Name of court: the Circuit Court of the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida

    (2) Docket or case number (if you know): 94-1299

(3) Date of filing (if you know): January 18, 2002.

(4) Nature of the proceeding: State Motion for Post-conviction Relief (Fla.R.Crim.P. 3.851)

(4) Did you appeal from the denial of your motion or petition?

    Yes   X               No    ☐

If you did appeal, answer the following:

(i)      Name of court: Florida Supreme Court

(ii)    Docket or case number (if you know): SC07-286.

(iii)   Result: Affirmed

(iv)   Date of result (if you know): September 18, 2008.

(v)    Citation to the case (if you know): 997 So.2d 1073 (Fla. 2008)

(e)    Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on this Ground: NA

13. Please answer these additional questions about the petition you are filing:

    (a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?    Yes X  No ☐

          If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: NA

(b) Is there any ground in this petition that has not been presented in some state or federal court? No. If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?   Yes ☐  No X

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court

29

opinion or order, if available.

15. Do you have any petition or appeal now pending (filed and not decided yet) in any

court, either state or federal, for the judgment you are challenging? Yes □  No X

If "Yes," state the name and location of the court, the docket or case number, the

type of proceeding, and the issues raised.

16. Give the name and address, if you know, of each attorney who represented you in the

following stages of the judgment you are challenging:

(a) At preliminary hearing: Richard Terrana and Robert Fraser

(b) At arraignment and plea: Richard Terrana and Robert Fraser

(c) At trial: Richard Terrana and Robert Fraser

(d) At sentencing: Richard Terrana and Robert Fraser

(e) On appeal: Andrea Norgard

(f) In any post-conviction proceeding: Robert T. Strain

(g) On appeal from any ruling against you in a post-conviction proceeding:

Robert T. Strain

17.  Do you have any future sentence to serve after you complete the sentence for the

judgment that you are challenging?

Yes  □  No  X

(a) If so, give name and location of court that imposed the other sentence you will

serve in the future: NA

(b) Give the date the other sentence was imposed:

30

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the

judgment or sentence to be served in the future?      Yes   □              No□

18.      TIMELINESS OF PETITION: If your judgment of conviction became final over

one year ago, you must explain why the one-year statute of limitations as

contained in 28 U.S.C. § 2244(d) does not bar your petition.[3]

---

[3]

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in
28 U.S.C. § 2244(d) provides in part that:
(1) A one-year period of limitation shall apply to an application for a writ of habeas
corpus by a person in custody pursuant to the judgment of a State court. The limitation
period shall run from the latest of —
> (A) the date on which the judgment became final by the conclusion of direct
> review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State
> action in violation of the Constitution or laws of the United States is removed, if
> the applicant was prevented from filing by such state action;
> (C) the date on which the constitutional right asserted was initially recognized by
> the Supreme Court, if the right has been newly recognized by the Supreme Court
> and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could
> have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other
collateral review with respect to the pertinent judgment or claim is pending shall not be
counted toward any period of limitation under this subsection.

31

Therefore, petitioner asks that the Court grant the following relief: setting aside the

judgment and sentence of death or any other relief to which petitioner may be entitled.

Robert T. Strain
Florida Bar No. 0325961
Assistant CCRC
Capital Collateral Regional Counsel
 -Middle Region
3801 Corporex Park Dr. - Suite 210
Tampa, FL 33169-1136
Telephone (813) 740-3544
Fax No. (813) 740-3554
Email: strain@ccmr.state.fl.us

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and
correct.

Executed (signed) on ___3 - 5 - 09___ (date).

Signature of Petitioner

32