UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EDDIE LEE SEXTON,

    Petitioner,

v.                      CASE NO. 8:09-CV-404-T-26TBM
                      DEATH PENALTY CASE

SECRETARY,
DEPARTMENT OF CORRECTIONS,

    Respondent.

_____/

**RESPONDENT'S ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIMS V, VI, AND VIII**

COMES NOW the Respondent, Secretary, Department of Corrections, State of Florida, by and through the undersigned Assistant Attorney General, and files this Answer to the Petition for Writ of Habeas Corpus filed herein. Respondent respectfully submits that the habeas petition should be denied without an evidentiary hearing for the reasons stated herein.

**PROCEDURAL HISTORY**

The following factual history is taken from the Florida Supreme Court's opinion affirming Sexton's convictions and death sentence on direct appeal after a retrial.

> . . . Sexton was initially tried and convicted of first-degree murder and sentenced to death in 1994 for the killing of Joel Good, the husband of Sexton's daughter, Estella Mae Good ("Pixie"). Joel was murdered by Sexton's mentally challenged twenty-two-year-old son, Willie Sexton, who strangled him to death under Sexton's direction. On appeal, this Court reversed the judgment and sentence and ordered a new

trial. See id. at 838. The Court determined that the testimony of five of Sexton's children concerning bizarre behavior and abuse they had endured from their father should not have been admitted because the relevance of the testimony was outweighed by its prejudicial impact. See id. at 837-38.

Upon retrial, Sexton was again convicted of first-degree murder and sentenced to death. Although much of the testimony introduced at the second trial was similar to the testimony introduced at the first trial, Willie testified. [n1] In exchange for his testimony against Sexton, Willie pled guilty to second-degree murder and was sentenced to twenty-five years imprisonment. The State's theory of prosecution was that Sexton so totally dominated, controlled and directed every facet of Willie's life that Willie killed Joel at Sexton's direction. On retrial, the State introduced the following evidence.

[n1] As noted in this Court's opinion in Sexton, 697 So.2d at 834-35, Willie was named a codefendant in Joel's death in the first trial but was later found incompetent to stand trial.

Sexton fled to Florida in 1993 with his family and the victim to avoid arrest and prevent the Ohio Department of Human Services ("DHS") from removing his children from the home. [n2] Sexton was the father of thirteen children, not counting the three children he allegedly fathered with his two daughters. After leaving Ohio, Sexton and his family moved to Oklahoma, Indiana, and eventually to Hillsborough River State Park in Florida. During this time, Sexton trained his children to use guns and a garrote, an apparatus used in strangulation, in case authorities came to return the children to foster care.

[n2] DHS had Sexton's six youngest children removed from the home in 1992. Several months later, three of the children were returned to Sexton's wife, Mrs. Sexton, but Sexton was ordered to have no contact with the children or with Mrs. Sexton. Following a hearing on the matter in November 1992, Sexton barricaded himself and his family in their home demanding the immediate return of his three children who remained in foster care. Sexton threatened to kill anyone from Child Protective

Services or the police department who tried to take his children. Eventually, Sexton turned himself in to the authorities. A search of the Sexton residence revealed a .357 revolver, a 20-gauge shotgun, and seventy rounds of ammunition. After his release, the Sextons failed to appear at a scheduled court hearing. Arrest warrants were issued for Sexton and his wife in October 1993.

While residing in Hillsborough River State Park, Sexton's infant grandchild, Skipper Lee Good, the son of Pixie and Joel, died under suspicious circumstances. Several of the Sexton children, including Pixie, testified about the events surrounding the baby's death. Pixie testified that the baby had been ill for several weeks, but Sexton would not allow her to take the child to a doctor out of fear that authorities would find him and his family. One night, the baby would not stop crying. Sexton ordered Pixie to quiet the baby or else he would do it for her. Pixie put her hand over the baby's mouth until the child stopped crying. The next morning the baby was dead. Sexton instructed Willie and Joel to bury the baby in the woods inside the Hillsborough River State Park. Pixie was eventually arrested for the death of the baby and entered into a plea bargain with the State. [n3]

> [n3] In exchange for a plea to manslaughter and testimony against Sexton, Pixie was sentenced to twelve years imprisonment.

According to Pixie, Joel was very upset over the loss of his child and wanted to bring the child back to Ohio for a proper burial. Shortly before the death of his infant son, Joel had learned Sexton was the father of Pixie's two daughters. After Joel confronted Sexton with this information, Sexton and Joel got into a fight. Because Joel knew about the baby's death and the fact that Sexton fathered two children with his daughter, Pixie, Sexton would not allow Joel and Pixie to return to Ohio. Sexton feared Joel would provide authorities with information pertaining to the Sexton family's current whereabouts, the death of the baby, and ongoing child abuse.

Several of the Sexton children, including Willie, Pixie, Matthew and Charles testified that Sexton often

3

referred to Joel as a "snitch" and stated that a "good snitch is a dead snitch." According to their testimony, Sexton often stated that Joel had to be disposed of because he "knew too much." In addition to the testimony of the Sexton children, Gail Novak, a librarian at the University of South Florida, also testified about a statement Sexton made in which he indicated his desire to have Joel killed. Novak testified that Sexton, Pixie, Joel and Willie came into the library in November 1993 and that Pixie requested information about crib death. Novak stated that she had overheard Willie telling Sexton that Joel intended to go back to Ohio. Sexton replied that the only way that Joel would be returning to Ohio would be in a "body bag."

At some point, the Sextons moved to Little Manatee State Park, the place where Joel was killed. Willie testified to the following course of events surrounding the murder. [n4] As Joel continued to express his interest in returning to Ohio, Sexton began telling his son, "Willie, I got a job for you to do," and that he wanted Willie to "put Joel to sleep." On the day of Joel's murder, Sexton told his wife that "today is the day that Willie is going" to kill Joel. Thereafter, Sexton, his wife, and a few of the younger Sexton children left the campsite for a picnic. Sexton's daughters Sherri Sexton, [n5] Pixie, and their respective children, along with Willie and Joel, stayed behind. Soon thereafter, Willie and Joel left the campsite and went into the woods. Both Pixie and Willie testified that Sexton returned from the picnic and joined Willie and Joel in the woods. According to Willie, Sexton told him to take the garrote out of his pocket and place it around Joel's neck. After placing the garrote around Joel's neck, Sexton told Willie to turn it "fast and hard." Willie told Joel that he was "just trying to put you to sleep." While Willie twisted the rope, Joel yelled "Eddie" (Sexton). After Willie saw blood coming out of Joel's ears, he asked Sexton what had happened. Sexton stated that Willie had just killed Joel. Sexton subsequently kicked the body and, upon seeing Joel's leg move, told Willie to "finish him off."

     [n4] On cross-examination, Willie admitted that he previously had told different versions of the events surrounding the murder of Joel. According to Willie, he

4

told different versions of the murder
because he feared Sexton and because he
wanted to get back at Sexton for all of the
bad things that Sexton did to him.

[n5] Sherri testified for the defense
in the first trial, see Sexton, 697 So.2d at
835, but did not testify in this trial.

In addition to Willie, several other Sexton
children testified to the events surrounding the
murder of Joel and provided testimony that differed
from Willie's recollections of the homicide. For
instance, according to Pixie, on the day of Joel's
murder, Sexton and Willie had gone for a walk.
Approximately thirty minutes later, Sexton and Willie
returned. After Sexton and several family members left
for the family picnic, Pixie and Sherri went into the
camper to prepare lunch, while Joel and Willie watched
television together. Thereafter, Pixie saw Willie and
Joel go into the woods. She followed them and found
them smoking cigarettes. Upon her return to the
campsite, she heard Joel yelling, "Ed." Pixie and
Sherri ran into the woods and found Willie holding a
rope around Joel's neck. Thus, Pixie and Sherri ran
back to the campsite and told Sexton, who had returned
from the picnic, that Willie was hurting Joel. After
leading Sexton into the woods to find Joel and Willie,
Pixie observed Willie holding Joel in his lap.
According to Pixie, Sexton proceeded to kick Joel's
leg and, when Joel's leg moved, ordered Pixie to
return to campsite and told Willie to "finish him
off."

Another one of Sexton's children, Charles Sexton,
who did not testify at the first trial, also testified
that he witnessed Joel's murder. His version of the
murder differed from both Pixie and Willie's version.
In particular, Charles testified that he witnessed the
murder and that Sexton actually committed the final
act that led to Joel's death. Charles claimed that
although he initially went along on the family picnic,
he returned from the picnic sooner than the rest of
the family. After finding the campsite empty upon his
return, Charles walked into the woods and observed
both Sexton and Willie killing Joel. Charles claimed
that while Joel was fighting for his life, he overhead
Sexton telling Willie, "It's either Joel or the both
of you." Charles also testified that although Willie
initially had placed the choking device around Joel's

5

neck, Sexton actually "finished Joel off" by pulling on the choking device.

As to the post-murder events, Pixie testified that when Sexton returned from the woods, he instructed her to get rid of Joel's belongings and told her that if she ever talked about Joel's murder that she "would be next." She also testified that Sexton ordered her and Charles to go and purchase a shovel. Willie stated that before placing Joel's body in the grave, Sexton ordered him to chop Joel's hands off with a machete so that there would be no fingerprint evidence to identify the body. [n6] Willie, however, was unable to complete this task.

> [n6]   The State's medical examiner, Doctor Marie Hermann, confirmed portions of Willie's testimony. According to Dr. Hermann, who assisted in the recovery of Joel's body and performed the autopsy, she observed a deep wound on the victim's right hand that was caused by a sharp instrument with great amount of force. The wound was consistent with an attempted dismemberment of the right hand. Dr. Hermann also observed that, upon recovery of Joel's body, there was a ligature device around Joel's neck. Dr. Hermann opined that the cause of death was asphyxiation as a result of ligature strangulation.

Later that evening, Pixie overheard Sexton discussing the killing with Mrs. Sexton, at which time, Sexton stated that he had Willie murder Joel. According to all of the Sexton children who testified, they were instructed by their father to tell anyone, if asked, that Joel had taken the baby and had returned to Ohio. Matthew Sexton also testified that his father told him not to say anything about Joel's death because Sexton and Willie "could get the electric chair."

The State presented evidence that Willie had killed Joel because he was ordered to do so by Sexton and because he was afraid of his father. Doctor Eldra Solomon, a clinical psychologist with extensive training in the treatment of child abuse and post-traumatic stress disorder, testified that Willie was controlled by his father, whom Willie "was very eager to please." After reviewing Willie's school records and having Willie conduct the Wechsler Intelligence

Test, Dr. Solomon concluded that Willie was developmentally behind and that he had problems with language, speech, memory and motor coordination. The I.Q. test revealed that Willie functioned at the level of a seven or eight-year-old and that ninety-nine percent of the people in his age group would have performed better on the test. Dr. Solomon opined that Willie could not comprehend the concept of death, suffered from post-traumatic stress disorder, and was incapable of planning a homicide.

When Willie talked about Sexton, Dr. Solomon noticed that Willie's demeanor changed dramatically. She observed that Willie began to shake, stammer and stutter, which Dr. Solomon believed were physical manifestations of his fears of his father. Both Dr. Solomon and many of the Sexton children, including Willie himself, testified regarding how Sexton had physically and mentally abused Willie. According to Willie, Sexton began having anal intercourse with him at age nine. This activity continued during the Sextons' stay in Florida. Sexton physically beat Willie with his fists, a belt, a baseball bat, and an electric belt. In addition, Sexton mentally abused Willie by calling him "retarded" and a "stutter bug." Sexton often told Willie, "I brought you into this world, I can take you out of it."

In contrast to the first trial, at the conclusion of the State's case, Sexton presented no defense during the guilt phase of the trial. The jury convicted Sexton and recommended death by a vote of eight to four. The trial court found the following aggravating circumstances: (1) Sexton was previously convicted of a prior violent felony (robbery) (little weight); (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest (great weight); and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification (CCP) (great weight). In mitigation, the trial court found one statutory mitigator, that Sexton was under an extreme mental or emotional disturbance at the time the murder was committed and gave this mitigator great weight. This mitigator was established based upon the testimony of two psychologists, Doctors Irving Weiner and Frank Wood, who observed Sexton. Dr. Weiner's testing of Sexton revealed that Sexton has an I.Q. in the low 80's, suffers from brain dysfunction, has

limited tolerance to stress, and has diminished self-control. Additionally, testing by Dr. Wood revealed that Sexton's brain was diseased, causing him to be non-responsive to emotional situations.

In addition, the trial court found and gave some weight to several nonstatutory mitigators: (1) Sexton was capable of kindness to children and would even act as Santa Claus at Christmas; (2) Sexton was the pastor of a church attended by family and friends; (3) Sexton often helped his mother and sisters with household chores and repairs; (4) Sexton's father died when the defendant was ten years old, depriving him of a male role model; and (5) the codefendant, Willie, received a lesser sentence of twenty-five years' imprisonment. Finding that the aggravators outweighed the mitigators, the trial court sentenced Sexton to death.

Sexton v. State, 775 So. 2d 923, 925-29 (Fla. 2000) (A18).

On direct appeal to the Florida Supreme Court, Petitioner raised the following five issues:

ISSUE I:  THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE TESTIMONY RELATING TO THE DEATH OF THE INFANT, SKIPPER LEE GOOD WHERE THE ADMISSION OF THIS EVIDENCE WAS NOT RELEVANT AND THE PREJUDICIAL IMPACT FAR OUTWEIGHED THE PROBATIVE VALUE.

ISSUE II:  THE TRIAL COURT ERRED IN FAILING TO ADEQUATELY ADDRESS APPELLANT'S REQUEST FOR NEW COUNSEL WHERE APPELLANT RAISED QUESTIONS REGARDING THE EFFECTIVENESS OF COUNSEL'S REPRESENTATION.

ISSUE III:  THE TRIAL COURT ERRED IN THE ADMISSION OF VICTIM IMPACT EVIDENCE WHEN THE CONTENT OF THAT EVIDENCE VIOLATED DUE PROCESS GUARANTEES OF BOTH THE FEDERAL AND FLORIDA CONSTITUTION.

ISSUE IV:  THE SENTENCE OF DEATH IS DISPROPORTIONATE BECAUSE THIS IS NOT THE MOST AGGRAVATED AND LEAST MITIGATED OF CASES.

ISSUE V:  THE PROVISION OF FLORIDA'S DEATH PENALTY STATUTE WHICH ALLOWS A DEATH RECOMMENDATION TO BE RETURNED BY A BARE MAJORITY VOTE VIOLATES THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

(A15).  The Florida Supreme Court affirmed Petitioner's judgment and sentence.  Sexton v. State, 775 So. 2d 923 (Fla. 2000) (A18).  Petitioner filed a motion for rehearing on October 26, 2000, which the Florida Supreme Court denied on December 21, 2000.  (A19-20).  On January 22, 2001, the Florida Supreme Court issued its mandate.  (A21).

On January 18, 2002, Petitioner filed in state circuit court a Motion to Vacate Judgment and Sentence pursuant to Florida Rule of Criminal Procedure 3.851[1] (B20:82-111), and filed an Amended Motion on March 21, 2002 (B1:45-98).  Petitioner raised the following claims in his state postconviction proceedings:

---

[1] Petitioner's state postconviction motion tolled the AEDPA's one-year time limitation.  Petitioner's judgment became final ninety days after the Florida Supreme Court issued its mandate, or April 22, 2001 (ninety days are given to allow Petitioner to file a petition for writ of certiorari in the United States Supreme Court, even when not done as in this case).  On January 18, 2002, some 271 days later, Petitioner filed his state postconviction motion.  Thus, Petitioner had 94 days to timely file the instant habeas petition at the conclusion of his state postconviction proceedings.  As will be discussed infra, the Florida Supreme Court affirmed the trial court's denial of postconviction relief on September 18, 2008, denied Petitioner's subsequent motion for rehearing on December 17, 2008, and issued its mandate on January 5, 2009.  On March 6, 2009, some sixty days later, Petitioner filed the instant federal habeas petition.  Accordingly, Petitioner appears to have timely filed the instant habeas petition.  However, if Respondent's calculations are incorrect, this Court may dismiss the petition as untimely under the AEDPA.  See Day v. Crosby, 391 F.3d 1192 (11th Cir. 2004).

CLAIM I:   MR. SEXTON'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION WERE VIOLATED AT THE GUILT PHASE BY COUNSEL'S INEFFECTIVENESS WHETHER DUE TO COUNSEL'S DEFICIENCIES OR BEING RENDERED INEFFECTIVE BY STATE ACTION.

CLAIM II: MR. SEXTON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE SENTENCING PHASE OF HIS TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. TRIAL COUNSEL FAILED TO ADEQUATELY INVESTIGATE AND PREPARE MITIGATING EVIDENCE, FAILED TO PROVIDE THE MENTAL HEALTH EXPERTS WITH THIS MITIGATION, AND FAILED TO ADEQUATELY CHALLENGE THE STATE'S CASE.   COUNSEL'S PERFORMANCE WAS DEFICIENT, AND AS A RESULT, MR. SEXTON'S DEATH SENTENCE IS UNRELIABLE.

CLAIM III:   MR. SEXTON'S SENTENCE OF DEATH VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS BECAUSE THE PENALTY PHASE JURY INSTRUCTIONS WERE INCORRECT UNDER FLORIDA LAW AND SHIFTED THE BURDEN TO MR. SEXTON TO PROVE THAT DEATH WAS INAPPROPRIATE AND BECAUSE THE SENTENCING JUDGE EMPLOYED THIS IMPROPER STANDARD IN SENTENCING MR. SEXTON TO DEATH, FAILURE TO OBJECT RENDERED DEFENSE COUNSEL'S REPRESENTATION INEFFECTIVE.

CLAIM IV:   FLORIDA'S CAPITAL SENTENCING STATUTE IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED FOR FAILING TO PREVENT THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY AND FOR VIOLATING THE GUARANTEE AGAINST CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.   TO THE EXTENT THIS ISSUE WAS NOT PROPERLY LITIGATED AT TRIAL OR ON APPEAL, MR. SEXTON RECEIVED PREJUDICIALLY INEFFECTIVE ASSISTANCE OF COUNSEL.

CLAIM V:  MR. SEXTON IS DENIED HIS RIGHTS UNDER THE FIRST, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDENCE PROVISIONS OF THE FLORIDA CONSTITUTION AND IS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN PURSUING HIS POST-CONVICTION REMEDIES BECAUSE OF THE RULES PROHIBITING MR. SEXTON'S LAWYERS FROM INTERVIEWING JURORS TO DETERMINE IF CONSTITUTIONAL ERROR WAS PRESENT.

CLAIM VI:  EXECUTION BY LETHAL INJECTION IS CRUEL AND/OR UNUSUAL PUNISHMENT AND VIOLATES MR. SEXTON'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND UNDER THE FLORIDA CONSTITUTION.

CLAIM VII:   THE  FLORIDA  DEATH  SENTENCING  STATUTE  AS APPLIED IS UNCONSTITUTIONAL UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AS CONSTRUED BY THE UNITED STATES SUPREME COURT IN *APPRENDI V. NEW JERSEY*.

CLAIM  VIII:   MR. SEXTON'S  CONVICTION  IS  MATERIALLY UNRELIABLE BECAUSE NO ADVERSARIAL TESTING OCCURRED DUE TO THE  CUMULATIVE  EFFECTS  OF  INEFFECTIVE  ASSISTANCE  OF COUNSEL, THE WITHHOLDING OF EXCULPATORY OR IMPEACHMENT MATERIAL, NEWLY DISCOVERED EVIDENCE, AND/OR IMPROPER RULINGS OF THE TRIAL COURT, IN VIOLATION OF MR. SEXTON'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

CLAIM IX:  MR. SEXTON'S EIGHTH AMENDMENT RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT WILL BE VIOLATED AS DEFENDANT MAY BE INCOMPETENT AT TIME OF EXECUTION.

After reviewing the State's written Answer (B1:99-200), and after hearing argument from counsel at a case management conference, the state postconviction court entered orders on March 11 and 13, 2003, denying all of Petitioner's postconviction claims with the exception of Claims II and VIII. (B2-B3:201-411).  Pursuant to these orders, an evidentiary hearing was conducted on these claims on April 6, 2006, May 12, 2006, and July 28, 2006.

After conducting an evidentiary hearing, the state trial court issued a detailed order denying Petitioner's postconviction claims. (B4-B11:760-2082).  Petitioner appealed

the case to the Florida Supreme Court, and raised the following issues on appeal:

ARGUMENT I: THE POSTCONVICTION COURT ERRED IN DENYING THE CLAIM THAT TRIAL COUNSEL WERE PREJUDICIALLY INEFFECTIVE IN THE PENALTY PHASE BECAUSE THEY FAILED TO ADEQUATELY INVESTIGATE AND PREPARE MITIGATING EVIDENCE, FAILED TO PROVIDE THE MENTAL HEALTH EXPERTS WITH THIS MITIGATION, AND FAILED TO ADEQUATELY CHALLENGE THE STATE'S CASE.

ARGUMENT II: THE TRIAL COURT ERRED IN DENYING GUILT PHASE CLAIMS WITHOUT AN EVIDENTIARY HEARING.

ARGUMENT III: THE TRIAL COURT ERRED IN DENYING THE CLAIM THAT APPELLANT'S CONVICTION IS MATERIALLY UNRELIABLE DUE TO THE CUMULATIVE EFFECTS OF INEFFECTIVE ASSISTANCE OF COUNSEL AND IMPROPER RULINGS OF THE TRIAL COURT.

ARGUMENT IV: THE TRIAL COURT ERRED IN DENYING HIS CLAIM THAT APPELLANT IS DENIED HIS RIGHTS UNDER THE FIRST, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION AND IS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN PURSUING HIS POSTCONVICTION REMEDIES BECAUSE OF THE RULES PROHIBITING APPELLANT'S LAWYERS FROM INTERVIEWING JURORS TO DETERMINE IF CONSTITUTIONAL ERROR WAS PRESENT.

ARGUMENT V: EXECUTION BY LETHAL INJECTION IS CRUEL AND/OR UNUSUAL PUNISHMENT AND VIOLATES APPELLANT'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND UNDER OF THE [SIC] FLORIDA CONSTITUTION.

ARGUMENT VI: APPELLANT'S EIGHTH AMENDMENT RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT WILL BE VIOLATED AS APPELLANT MAY BE INCOMPETENT AT TIME OF EXECUTION.

(B30).

On September 18, 2008, the Florida Supreme Court affirmed the trial court's denial of Petitioner's postconviction claims. Sexton v. State, 997 So. 2d 1073 (Fla. 2008) (B33). On October 2, 2008, Petitioner filed a motion for rehearing which was

denied by the Florida Supreme Court on December 17, 2008.  (B34-35).  The court issued its mandate on January 5, 2009.  (B36).

On March 6, 2009, Petitioner filed with this Court a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.[2] (Dkt. 1).  Pursuant to this Court's order of March 9, 2009, Respondent filed a motion to dismiss a number of Petitioner's claims.  On September 16, 2009, this Court issued an order dismissing claims I, II, III, IV, VII, and IX of the habeas petition and requiring Respondent to file a brief on the merits as to claims V, VI, and VIII.  Accordingly, Respondent submits the instant response to claims V, VI, and VIII for this Court's consideration.

## PRELIMINARY STATEMENT/STANDARD OF REVIEW

Respondent has previously filed the complete state court record with this Court (Dkt. 10, Exs. A-B37), and will cite to the appropriate exhibits within Document 10 as A__ or B__.

The instant habeas corpus petition was filed on March 6, 2009, and thus is a post-AEDPA case.  Aside from a token reference to the AEDPA at the conclusion of his petition, not once in any of the remainder of his petition does the Petitioner even reference the AEDPA or remotely present any arguments applying the mandatory requirements of the AEDPA.  Under 28

---

[2] Neither the District Court Judge nor the Magistrate Judge currently assigned to this cause were involved in Petitioner's state court proceedings.

U.S.C. § 2254, an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

>       (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>       (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

In his federal habeas petition,[3] there is not even a single allegation, nor any discussion by Petitioner at all, as to whether, or how, the state courts' resolution of his current habeas claims allegedly were either "contrary to" United States Supreme Court precedent or involved an "unreasonable application" of such precedent under the AEDPA. See Williams v. Taylor, 529 U.S. 362, 379, 120 S. Ct. 1495, 1505 (2000). Therefore, the instant petition is facially insufficient, as a matter of law, under the AEDPA. See also Hendrix v. McDonough, 2007 U.S. Dist. Lexis 32657 (M.D. Fla. May 1, 2007) (wherein this Court noted that the habeas petition must be dismissed as facially insufficient because Petitioner never presented any

---

[3]   Petitioner did not simultaneously file a memorandum of law in support of his position.

argument or citations in his 143-page petition and memorandum regarding the AEDPA).

In Williams, the Supreme Court explained that a state court decision is "contrary to" clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case. The question is whether the state court correctly identified the proper rule of law to be applied. A state court decision is not "contrary to" established federal law even if a federal court might have reached a different result relying on the same law. Williams, 529 U.S. at 406.

A state court conducts an "unreasonable application" of clearly established federal law under § 2254(d)(1) only if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. Even if the federal habeas court concludes that the state court applied federal law incorrectly, relief is appropriate only if the application is also objectively unreasonable. Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850 (2002). In addition, a state court's factual findings are presumed correct unless the petitioner rebuts them by clear and

convincing evidence.   28 U.S.C. § 2254(e)(1); <u>Marquard v. Sec'y</u> <u>for Dep't of Corr.</u>, 429 F.3d 1278, 1303 (11th Cir. 2005).

Other than his solitary recognition of the AEDPA's 1-year statute of limitations at the conclusion of his petition, Petitioner utterly fails to (1) acknowledge his burden to overcome the presumption of correctness attached to state court factual findings, (2) identify the clearly established Supreme Court precedent, and (3) allege that the adjudication of his claims in state court either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

Viewed under the AEDPA's mandatory standards, the legal insufficiency of Petitioner's petition is plain.   Petitioner repeatedly asserts conclusory facts, many of which are directly refuted by the state courts' factual findings, which Petitioner, conspicuously, does not even acknowledge.   At no point in his petition does Petitioner offer any support for his conclusory allegations that the state courts' rejections of his legal claims were either "contrary to" clearly established federal law or the result of an "unreasonable application of" established federal law to the facts of his case.   At the very least,

Petitioner's habeas petition must specifically allege and identify what federal law was applied by the state courts, and whether his currently alleged federal habeas claim arises because it allegedly was either "contrary to" Supreme Court precedent or involved an "unreasonable application of" such precedent under the AEDPA. Petitioner's petition fails to offer any of these bare minimum requirements and, therefore, it is facially and legally insufficient under the AEDPA.

### **THE AEDPA STANDARD FOR FEDERAL EVIDENTIARY HEARINGS**

No evidentiary hearing is warranted in this case on any of Petitioner's claims. The Eleventh Circuit has acknowledged that the AEDPA brought a significant change to the standards governing the granting of evidentiary hearings in federal habeas cases. In <u>Breedlove v. Moore</u>, 279 F.3d 952, 959 (11th Cir. 2002), the court stated:

> One purpose of the AEDPA has been to simplify and speed the federal habeas process; consistent with this goal, the AEDPA added the following provision to § 2254:
>
>> If the applicant has failed to develop the factual basis of a claim in state court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>>
>> (A) the claim relies on
>>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. 2254(e)(2).

This provision places a fairly stringent limitation on the power of the federal courts to order evidentiary hearings in habeas cases. Indeed, if a petitioner fails to develop an adequate factual record in the state courts, an evidentiary hearing could only be ordered if one of the two narrow exceptions to the general rule prohibiting such hearings applied.

The burden is on the petitioner in a federal habeas corpus proceeding to show the necessity for an evidentiary hearing. See, e.g., Williams v. Griswald, 743 F.2d 1533 (11th Cir. 1984); Birt v. Montgomery, 725 F.2d 587 (11th Cir. 1984). No evidentiary hearing is required by a district court if a state court has made findings of fact, as the federal courts must presume those facts to be correct. Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745 (1963); 28 U.S.C. 2254(d). Petitioner was given a full and fair evidentiary hearing in state court to develop his postconviction claims. None of his claims require factual development during an evidentiary hearing.

<u>**ARGUMENT**</u>

<u>**GROUND V**</u>

**WHETHER FLORIDA'S DEATH PENALTY STATUTORY SCHEME IS UNCONSTITUTIONAL BECAUSE IT ALLOWS A JURY TO RETURN A DEATH RECOMMENDATION BY A MAJORITY VOTE?**

There are two prerequisites to federal habeas review: (1) the applicant must have fairly apprised the highest state court with the appropriate jurisdiction of the federal rights allegedly violated, and (2) the applicant must have presented his claims in state court in a procedurally correct manner. <u>Upshaw v. Singletary</u>, 70 F.3d 576, 578-79 (llth Cir. 1995).

Ground V of Petitioner's habeas petition alleges that Florida's death penalty statute is unconstitutional because it allows the jury to recommend the death penalty by a majority vote. On direct appeal, Petitioner raised this claim in his brief as Issue V, <u>see</u> Dkt. 10, A15 at 70-73. The Florida Supreme Court rejected the claim:

> For his final claim, Sexton attacks the constitutionality of Florida's capital sentencing statute, which authorizes a death sentence recommendation by a bare majority vote. This argument has been previously rejected by this Court. <u>See, e.g.</u>, <u>Larzelere</u>, 676 So. 2d at 407 n.7; <u>Hunter v. State</u>, 660 So. 2d 244 (Fla. 1995) (citing <u>James v. State</u>, 453 So. 2d 786, 792 (Fla. 1984)). In addition, this was not a bare majority vote case because the jury recommended the death penalty by a vote of eight to four.

<u>Sexton v. State</u>, 775 So. 2d 923, 937 (Fla. 2000).

19

Petitioner preserved the instant claim by raising it in the Florida Supreme Court in a procedurally proper manner.  However, in order for Petitioner to be entitled to federal habeas relief on his claim which was denied on the merits, he must establish that the Florida Supreme Court's resolution of this claim was contrary to, or an unreasonable application of, clearly established federal law.  In this case, as previously noted, Petitioner has not even attempted to establish how the Florida Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law.  Presumably, this is because Petitioner recognizes that the Florida Supreme Court's decision is not contrary to, or an unreasonable application of, any United States Supreme Court decision.

Petitioner's claim that Florida's capital sentencing scheme, Florida Statutes, section 921.141, is unconstitutional is meritless.  In fact, the courts have upheld the statute against constitutional challenge.  Proffitt v. Florida, 428 U.S. 242 (1976); Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir. 1978); Harich v. Wainwright, 813 F.2d 1082, 1102 (11th Cir. 1987).

Pursuant to the AEDPA, it is Petitioner's responsibility to demonstrate on this question of law that the state court determination resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

20

Federal law as determined by the Supreme Court of the United States.  He has failed to satisfy this burden as the United States Supreme Court in <u>Proffitt</u>, <u>supra</u>, upheld the statute against constitutional challenge, and has upheld the Florida statutory scheme numerous times since then.  <u>See also</u> <u>Spaziano v. Florida</u>, 468 U.S. 447, 104 S. Ct. 3154 (1984) (holding that trial court's imposition of sentence of death after jury had recommended life imprisonment did not violate the Eighth Amendment).  Because Petitioner has failed to carry his burden under the AEDPA, this Court should deny the instant claim.

<u>**GROUND VI**</u>

**WHETHER THE STATE COURT ERRED IN DENYING PETITIONER'S CLAIM OF INEFFECTIVE ASSISTANCE OF PENALTY PHASE COUNSEL?**

Petitioner asserts in ground VI that the state postconviction court erred in denying his claim of ineffective assistance of penalty phase counsel.  Petitioner raised the instant claim in his state postconviction motion and was granted an evidentiary hearing on his claim.  After hearing the testimony from the evidentiary hearing, the state postconviction court denied Petitioner's ineffective assistance of penalty phase counsel claim.  Petitioner appealed to the Florida Supreme Court and raised the instant issue as claim I in his brief.  <u>See</u> B30 at 27-42.  The Florida Supreme Court's decision affirming the denial of postconviction relief extensively discussed the

21

testimony from the state postconviction evidentiary hearing and analyzed Petitioner's ineffective assistance of counsel claim under the proper legal standard set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  The court stated:

> In his first issue on appeal, Sexton argues that the trial court erred in denying his claim that counsel was ineffective in the penalty phase for failing to adequately investigate and present mitigation evidence regarding Sexton's childhood and background, including his deprived upbringing, physical abuse by a sibling, lack of parental supervision, multiple sclerosis, and other medical problems. Sexton also alleges that his counsel failed to provide this additional mitigation to the mental health experts and was ineffective in the presentation of the mental health mitigation through two psychologists, primarily focusing on the results of a PET scan that disclosed brain dysfunction.
>
> In order to prevail on his claim of ineffective assistance of counsel in investigating and presenting background mitigation, Sexton must satisfy the deficiency and prejudice prongs as set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Wiggins v. Smith, 539 U.S. 510, 533, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). "Rather, in deciding whether trial counsel exercised reasonable professional judgment with regard to the investigation and presentation of mitigation evidence, a reviewing court must focus on whether the investigation resulting in counsel's decision not to introduce certain mitigation evidence was itself reasonable." Ferrell v. State, 918 So.2d 163, 170 (Fla. 2005) (citing Wiggins, 539 U.S. at 523, 123 S. Ct. 2527, and Strickland, 466 U.S. at 690-91, 104 S. Ct. 2052). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the

circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla. 2004).

This Court has recognized that "the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated." State v. Lewis, 838 So.2d 1102, 1113 (Fla. 2002). Clearly, "[a]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." Ragsdale v. State, 798 So.2d 713, 716 (Fla.2001) (quoting State v. Riechmann, 777 So.2d 342, 350 (Fla. 2000)).

This is not a case where trial counsel failed to investigate, obtain or provide any background or childhood mitigation and could not therefore make a reasoned strategic decision about its presentation. Cf. Riechmann, 777 So.2d at 350 (finding counsel deficient where they conducted "no investigation and presented no evidence of mitigation"); Rose v. State, 675 So.2d 567, 572 (Fla. 1996) (finding representation deficient where "counsel never attempted to meaningfully investigate mitigation"). Nor is this a case where counsel did not take reasonable steps to investigate Sexton's background for mitigation. Cf. Ragsdale, 798 So.2d at 719 (holding that counsel was ineffective due to inadequate investigation and failure to present certain mitigators where "counsel's entire investigation consisted of a few calls made by his wife to Ragsdale's family members").

Sexton instead primarily criticizes his trial counsel for a so-called "rifle" approach, which highlighted strong mental mitigation, rather than a "shotgun" approach that would include any and all factors discovered by counsel that might conceivably be considered mitigating. Further, Sexton claims that counsel was deficient for failing to understand the law of mitigation, as set forth in Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978),[Footnote 6] and its progeny.

Footnote 6: Lockett held that the sentencing judge or jury may not be precluded from considering any evidence regarding mitigating circumstances that is proffered by a defendant. 438 U.S. at 604, 98 S. Ct. 2954; see also Coday v. State, 946 So.2d 988, 1013 (Fla. 2006) ("The United States Supreme Court in a case from Florida held that a sentencer could not refuse to consider or be precluded from considering any relevant mitigating evidence." (citing Hitchcock v. Dugger, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987))), cert. denied, --- U.S. ----, 127 S. Ct. 2918, 168 L. Ed. 2d 249 (2007).

23

Initially, it should be noted that Sexton was represented by the same two attorneys at both the first and second trials. Therefore, trial counsel was cognizant of the mitigation that was presented in the first trial, which resulted in a jury recommendation of death by a seven-to-five vote where no mental mitigation was presented.[Footnote 7]. In contrast, at the second sentencing proceeding, penalty phase counsel presented two mental health experts to establish that Sexton suffered from brain damage, in addition to presentation of other nonstatutory mitigation similar to that presented in the first trial. As we will now discuss, we agree with the trial court that Sexton has failed to demonstrate that counsel was deficient in his mitigation investigation or presentation.

Footnote 7: In the first penalty phase, the trial court made the following findings on mitigation: (1) that Sexton was under emotional strain due to the efforts of Ohio officials to take custody of his children; (2) that he acted in a peculiar fashion at times; (3) that he demonstrated some human qualities; (4) that he played Santa Claus on at least one occasion and appeared to some as normal; and (5) that letters from family members described Sexton as kind, respectful, and helpful. The trial court found that the evidence did not support the claim that Sexton was disabled and dependent on pain medication.

A. Childhood and Background Mitigation

In his first sub-claim, Sexton argues that counsel should have presented more detail about his impoverished and abused early life to support mitigation. To establish this claim, Sexton presented the testimony of Janet Vogelsang, a forensic social worker, who testified at the evidentiary hearing that the circumstances of Sexton's childhood would have caused him to grow up without any understanding of normal and appropriate behavior. In her interviews with Sexton's family members in 2004, she was told of his family's poverty, the lack of adult guidance due to his father's early death and his mother's long-term disability through his critical years of development, and the serious physical abuse he suffered at the hands of his older brother, Otis. Sexton's brother, David, was her main source of information about the family's poverty and the alleged physical abuse of Sexton by Otis. David Sexton's 2005 deposition testimony was also presented at the evidentiary hearing, in which he reported that Otis

consistently abused and beat up Sexton when they were children.

David's report of Otis's abusive behavior toward Sexton was contradicted by Sexton's sister, Nellie Hanft, who testified at the first and second penalty phases, and by Sexton himself. Nellie told Vogelsang only that Otis hit Sexton in the stomach once. Sexton told Vogelsang that Otis's treatment of him was "rough" but did not mention a consistent pattern of abuse by Otis. Otis's deposition was also admitted into evidence, in which he denied all allegations of abuse. In David's first deposition taken before trial, he made no reports of poverty and physical abuse of Sexton as he was growing up. Vogelsang conceded that the reports of abuse were the first the family had given along these lines and that they did not report these same problems to Sexton's trial counsel at the time of trial. Further, from the evidence received at the evidentiary hearing and his own admission, David harbored ill feelings against Otis, who had reported to authorities that both David and Sexton had sexually abused their daughters. Vogelsang testified that she was not aware of this rancor between her main source, David, and his brother Otis.

David's credibility was assessed by the trial court, which stated that it "doubt[ed] the credibility of [David's] April 20, 2005 deposition testimony, especially in light of his prior testimony during the August 9, 1994 deposition." Also, in contradiction to Vogelsang's testimony, penalty phase counsel, Robert Fraser, testified that in his interviews with David Sexton and Nellie Hanft before trial, he was told that their childhood with Sexton had been normal. For instance, Nellie told him that their family was one of simple country folk who were religious and, while not affluent, were not poverty-stricken. Fraser said, "I don't remember any deprivation at all from his childhood." His notes from family interviews also disclosed that Sexton played baseball and football, ran track, and also worked at a bowling alley.

Fraser also explained the difficulty he had in obtaining mitigation information from family members by stating:

His family was kind of a study in shifting alliance. One day his brother might love him; the next day or the next month or the next year he would probably hate him. And then, of course, so many people-so many members of his family, particularly his children testified repeatedly that they suffered at

his hands sexual batteries. He doesn't seem to have many friends or he didn't seem to have many friends. He was just-it was just very difficult.

... Nothing is volunteered. This goes back to what I was telling Mr. Strain how in some families they just close the door and they don't let you into the closet. They don't let you see the skeletons.

This is probably the worst case of this type I had ever seen. It was the most impenetrable.

Although Fraser was able to interview Sexton's wife, Estella, at the Ohio Reformatory for Women and she told him Sexton said he had been beaten as a child, Fraser explained that Sexton never told him of any such beatings. The other information Estella reported was clearly not of a mitigating nature, including that Sexton had raped and impregnated her younger sister, routinely beat her and their children, was abusive and controlling, and lied about going to Vietnam.

Even assuming that some testimony about physical abuse or childhood trauma suffered by Sexton could have been presented, Fraser explained, "The fact that Eddie was older seemed to strain the connection between childhood trauma, problems and so forth and his behavior 40 odd years later." The trial court found that Sexton failed to demonstrate that counsel was deficient on this issue. In fact, the postconviction court specifically "[found] the testimony of Fraser to be highly credible and the evidence to be persuasive" and concluded that Fraser performed a reasonable investigation into Sexton's childhood and background to discover any possible mitigation and provided that information to the experts. We agree.

As to Sexton's early background, Fraser made numerous requests for medical and school records. He interviewed and deposed family members, traveling to Ohio in some instances to do so. Counsel employed an experienced investigator to assist in discovering available mitigation. Sexton, his brother David, and his sister Nellie gave no reports to Fraser of childhood difficulties, extreme poverty, or abuse. Any deficiency in obtaining background and childhood mitigation was caused by the reticence of Sexton and his family members at the time of trial and by the unavailability of records from some forty years earlier.

Based on our complete review of the record, we find that competent, substantial evidence supports the trial court's finding that counsel made a reasonable investigation into Sexton's background and childhood for

mitigating circumstances; and that counsel presented the information he was able to obtain, given the reticence of family members and his own client to report any unfavorable family history and the inability to obtain certain records that were no longer available.[Footnote 8] Counsel's investigation can be considered reasonable where counsel interviews all witnesses brought to his attention, but learns little that is helpful and much that is harmful. See Wiggins, 539 U.S. at 525, 123 S. Ct. 2527 (citing Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987)).

Footnote 8: As found by the trial court, the evidence established that Fraser provided the background information and medical and health records that he did obtain to the experts who testified at the penalty phase. Those records included: Sexton's letters and notes; letters from Ironton City Schools; letters to and from psychiatrist Dr. Michael S. Maher, who had examined Sexton prior to the first trial; requests made for hospital records; Sexton's medical records from Dr. Lawrence Saltis, M.D.; jail medical records from Hillsborough County; medical records from Massilon County hospitals; medical records from Union Correctional Institution; memos and notes regarding interviews with Sexton and various witnesses; memos from defense investigator Richard Hart; and letters from Drs. Irving Weiner and Frank Wood, who testified at the retrial.

Further, the jury actually heard substantial evidence of Sexton's childhood and background, including that Sexton's father died when he was only ten, that his mother was disabled by a stroke during his childhood, that Sexton had a low IQ, and that he later developed multiple sclerosis and other serious medical problems. "The fact that a more thorough and detailed presentation could have been made does not establish counsel's performance as deficient" where nonstatutory childhood mitigation evidence was introduced. Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986).

Similarly, counsel was not shown to be ineffective in his decision to forgo presentation of evidence of Sexton's army service or his undesirable discharge. As counsel concluded, although he was aware of Sexton's army service, he did not think that information would have been helpful or mitigating. Sexton has simply not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"

Strickland, 466 U.S. at 689, 104 S. Ct. 2052 (quoting
Michel v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 100
L. Ed. 83 (1955)). Therefore, the trial court was correct
in finding that Sexton failed to show counsel was
ineffective in regard to obtaining or presenting this
childhood and background mitigation. Accordingly, we
affirm the trial court's denial of Sexton's claim that
counsel was ineffective in investigating and presenting
mitigating evidence from his childhood and background.

Mental Health Mitigation
     Sexton also claims that penalty phase counsel was
ineffective in his presentation of mental mitigation. In
deposition testimony admitted at the evidentiary hearing,
Dr. David McCraney, a neurologist, testified that having
the mitigation case revolve around the PET scan "was a big
mistake" because it did not emphasize the deleterious
effect of the brain dysfunction on Sexton's ability to
control his behavior and to form intent. In Dr. McCraney's
opinion, more emphasis should have been placed on Sexton's
inability to resist impulses and his memory deficits,
which would have impaired intent formulation. Importantly,
however, Dr. McCraney conceded that this was a deficiency
of the experts and not trial counsel, and that, although
the expert evaluation should have been done in more detail
focusing on intent formulation, the expert "lucked out"
and chose the right tests to disclose the brain
abnormality. He stated:
     I'm going to frame this as a deficiency of the
   experts rather than trial counsel. I know that's the
   way it shakes out.
     I mean, he's operating based on the advice that
   was given to him, but I feel that the
   neuropsychological evaluation should have been done in
   considerably more detail focusing on intent
   formulation.
     I mean, there was really only one test of intent
   formulation that was administered. And fortunately, I
   guess, the doctor chose the right test because it came
   out abnormal so he wound up stumbling onto the correct
   conclusion. But that was, you know, probably about 50
   percent luck and 50 percent being smart about it
   choosing the test that he did administer.
The postconviction court denied relief on this aspect of
Sexton's claim, finding that the testimony of Drs. Irving
Weiner and Frank Wood, which was presented during the penalty
phase of the retrial, was similar to that proposed by Dr.

McCraney. The court noted that "Dr. Weiner did reach the same conclusion [as Dr. McCraney] and informed the jury and the Court that the results of his evaluation suggested Defendant's behavior was consistent with brain dysfunction, and Defendant had limited tolerance for stress and diminished self-control, and Dr. Wood corroborated that information with the PET scan." This characterization of the penalty phase testimony also appears in the sentencing order of the trial court, which stated:

Two psychologists, Dr. Weiner and Dr. Wood, examined the defendant. Dr. Weiner's testing of the defendant revealed an I.Q. in the low 80s and showed large differences between his abilities in different measures. His scores on some tests ranged from 16 percentile to 2 percentile suggesting some kind of brain dysfunction. Dr. Weiner recommended a Positron Emission Tomography (PET) scan and that was administered by Dr. Wood. According to Dr. Wood it revealed a dysfunctional limbic system in the lower half of the brain. [Footnote 9] An MRI examination conducted on the defendant following an automobile accident in 1991 showed structural injury on the top half of his brain as well. Dr. Wood opined that, as a result, the defendant does not respond normally to emotional situations and has memory deficits confining his functions to the present moment without a continuity of information from the past that normal people have. Dr. Weiner opined that the defendant had a "rather limited tolerance for stress" tending to diminish his self control below the normal level of expectation.

Footnote 9: The PET scan disclosed deficits in the limbic region of Sexton's brain. The limbic system is a group of subcortical structures located in the lower portion of the brain, lying underneath the thalamus and includes the hypothalamus, amygdala and the hippocampus. The limbic system is especially concerned with emotion and motivation, see Merriam-Webster's Collegiate Dictionary 675 (10th ed. 1999), and according to Dr. Wood, dysfunction in the limbic system can cause impulsivity, intolerance to stress, lack of self-control, and bizarre responses to events.

Penalty phase counsel explained his theory of the defense was that Sexton had clearly demonstrable brain damage, as was documented by the PET scan. The mental mitigation was channeled in this fashion because in his experience actual brain damage was usually a very

persuasive mitigator. Also significant to counsel's decision was the fact that, prior to the first trial, Sexton was examined by Dr. Michael Maher, a forensic psychiatrist, who concluded that Sexton was a "sadistic sexual psychopath." [Footnote 10] Fraser explained that Dr. Maher said that Sexton's history of bizarre sexual and criminal behavior might in some way indicate a mental illness, but the details of that behavior would be so inflammatory to a jury that it would counteract any possible mitigation. Dr. Maher further informed Fraser by letter that he had "examined Mr. Sexton thoroughly with regard to possible mental health defenses and found none that would be even remotely possible." Fraser explained that Dr. Maher's description of Sexton as a sadistic sexual psychopath, if heard by the jury, would be "tantamount to stipulating to death."

Footnote 10: "Sexual sadism" is classified as a "sexual disorder" under the category of paraphilia in the Diagnostic and Statistical Manual of Mental Disorders, § 14 (302.84) (4th ed. 2007) ("DSM-IV"). Dr. Stein testified that a "sexual psychopath" is someone who is antisocial and acts out in a sexually deviant way. "Sadistic sexual psychopath" has been used to describe a type of personality disorder. See State v. Castaneda, 150 Ariz. 382, 724 P.2d 1, 11 (1986) (involving psychiatric testimony that being a sexual psychopath is a personality disorder as opposed to a mental illness).

Clearly, if counsel had put on additional mental health evidence, it would have opened the door to further evidence that could have been damaging. Dr. Barbara Stein, a board-certified psychiatrist retained by the State before the second trial, testified at the evidentiary hearing that Sexton had an "antisocial personality disorder with ... histrionic personality traits." [Footnote 11] She said this was reflected in his undesirable army discharge, his robbery conviction, having sex with his children, the fact that he raped his sister-in-law, his being something of a con man, his poor educational and occupational adjustment, and his substance abuse. She also concluded that he had "paraphilia not otherwise specified," which is a sexually deviant disorder that can include pedophilia or hebephilia. [Footnote 12]

Footnote 11: Sexton contends that Dr. Stein testified that the neuropsychological testing done for the trial was "not adequate," but the inadequacy she cited was Dr. Weiner's failure to test and control for possible

30

malingering, or the faking of symptoms, by Sexton during the testing.

Footnote 12: Dr. Stein explained that paraphilia is a deviant sexual disorder that includes pedophilia and hebephilia. See DSM-IV § 14 (302.70, 302.2). Pedophilia refers to sexual interest in or activity with pre-pubescents, while hebephilia refers to the sexual interest in or activity with adolescents.

According to Dr. Stein, Sexton's paraphilia did not impair his ability to appreciate the criminality of his conduct or his ability to conform it to the requirements of the law at the time of the murder. Dr. Stein testified that neither the brain deficits identified in Sexton nor his multiple sclerosis would have caused the violent behavior he exhibited at the time of the crime, impaired his capacity to appreciate the criminality of his conduct or to conform it to the law, affected his ability to be goal-directed, organized and able to plan, or prevented him from knowing right from wrong. This was shown, she said, by the detailed and extensive questions Sexton had prepared for counsel to ask at trial and the videotape Sexton made for government officials, in which he complained of the treatment his family received from social workers in Ohio.

Because Dr. McCraney attributed the alleged deficiencies in presentation of mental mitigation to the experts and not to counsel, and because the expert testimony given by Drs. Weiner and Wood was substantially similar to the testimony that Dr. McCraney believed was essential, Sexton has failed to establish that trial counsel was ineffective in obtaining and presenting mental mitigation. The fact that Dr. McCraney, some seven years later, disagreed with the extent or type of testing performed, or the type of mitigation presented, does not mean that trial counsel was deficient at trial. See Stephens v. State, 975 So.2d 405, 415 (Fla. 2007) ("Being able to secure an expert witness to provide an opinion as to mental health mitigation during postconviction proceedings, which arguably could have been helpful to [the defendant], does not, in and of itself, render trial counsel's performance ineffective." (agreeing with trial court's finding)); Peede v. State, 955 So.2d 480, 494 (Fla. 2007) ("The fact that Peede produced more favorable expert testimony at his evidentiary hearing is not reason enough to deem trial counsel ineffective.")

Moreover, in view of the initial unfavorable report by Dr. Maher, Fraser reasonably decided to focus on actual

brain damage as the main mitigator and was not deficient in this respect. See Dufour v. State, 905 So.2d 42, 57 (Fla. 2005) (finding that counsel was not deficient by failing to retain a new expert after receiving an unfavorable report from an examining mental health expert). Penalty phase counsel's limitation of mental mitigation to brain dysfunction was also reasonable considering that going beyond that would have opened the door to the testimony of the State's expert that, at the time of the crime, Sexton had antisocial personality disorder and paraphilia, and in light of Dr. Maher's original characterization of Sexton as a sadistic sexual psychopath. See Willacy v. State, 967 So.2d 131, 143-44 (Fla. 2007) (concluding that counsel's strategy to forgo presentation of some mental mitigation was reasonable where it "would have opened the door to aggravating facts," including the defendant's prior bad acts, threats of violence, and cruelty to animals).

In summary, competent, substantial evidence presented at the postconviction hearing established, and the postconviction court found, that penalty phase counsel made an informed strategic decision to focus on actual brain damage as statutory mental mitigation and was successful in convincing the trial court to find and assign great weight to the statutory mitigator of extreme mental or emotional disturbance based on the experts' testimony. Sexton has failed to demonstrate that penalty phase counsel was deficient in any respect in investigating or presenting Sexton's childhood and background mitigation or mental mitigation. Therefore, the trial court's order denying relief on this claim is affirmed.

Sexton v. State, 997 So. 2d 1073, 1078-85 (Fla. 2008).

Respondent submits that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law. The state court properly analyzed Petitioner's ineffective assistance of counsel claim under the governing legal standard set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052

(1984). The state court correctly noted that Petitioner's trial counsel made a strategic decision regarding the presentation of mitigation evidence and chose to utilize a "rifle" approach of highlighting strong mental mitigation with two expert witnesses rather than a "shotgun" approach of presenting any and all factors discovered by counsel that could conceivably be considered mitigating in nature.[4]

The law is well established that defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected. See United States v. Oliveras, 717 F.2d 1, 3 (1st Cir. 1983) ("[T]actical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance."). In the instant case, after conducting a full and fair evidentiary hearing on his claim, the state courts found that Petitioner's trial counsel had valid strategic reasons for his decisions regarding the investigation and presentation of mitigating evidence at the penalty phase. Clearly, as the state courts properly found, Petitioner has failed to establish deficient performance as required by

---

[4] As was noted by the state court, trial counsel had the benefit of having represented Petitioner in his prior trial and sentencing proceeding which resulted in a seven-to-five jury recommendation where no mental mitigation was presented. In contrast, at Petitioner's second sentencing proceedings at issue in this case, trial counsel made the strategic decision to present mental mitigation from two mental health experts.

<u>Strickland</u>.   Petitioner's trial counsel performed an extensive investigation into his background, and counsel made strategic decisions in determining which evidence to present to the jury. Petitioner has failed to carry his burden of demonstrating that the state courts' resolution of this issue was contrary to, or an unreasonable application of, clearly established federal constitutional law.

Furthermore, in denying Petitioner's claim, the state courts made numerous factual findings that are presumed correct unless Petitioner rebuts them by clear and convincing evidence. <u>See</u> 28 U.S.C. § 2254(e)(1); <u>Marquard v. Sec'y for Dep't of Corr.</u>, 429 F.3d 1278, 1303 (11th Cir. 2005).   Petitioner has not even attempted to rebut these factual findings or demonstrate how the state courts' resolution of this claim was contrary to, or an unreasonable application of, clearly established federal law.   Accordingly, this Court should deny Ground VI of Petitioner's Petition for Writ of Habeas Corpus.

<u>**GROUND VIII**</u>

**WHETHER THE STATE COURT ERRED IN DENYING PETITIONER'S CLAIM THAT THE CUMULATIVE EFFECTS OF INEFFECTIVE ASSISTANCE OF COUNSEL AND IMPROPER TRIAL COURT RULINGS RENDERED HIS CONVICTION MATERAILLY UNRELIABLE?**

In his eighth claim, Petitioner reasserts numerous claims and asserts that, when viewed cumulatively, these errors deprived him of his constitutional rights.   Petitioner's claims,

34

however, do not gain strength by repetition. Specifically, Petitioner combines a number of claims into his cumulative error claim and alleges: (1) that the postconviction court denied him the opportunity to present some of his guilt phase ineffective assistance of counsel claims by limiting the scope of the evidentiary hearing; (2) that the Florida Supreme Court noted trial counsels' deficiency in failing to object to the admission of evidence regarding the death of Skipper Lee Good; and (3) that trial counsel failed to object to victim impact evidence.

Petitioner raised his cumulative error claim in his state court postconviction motion and the trial court denied the claim.  See B4 at 785-86.  On appeal to the Florida Supreme Court, Petitioner again raised the issue, and the court denied it:

> Sexton contends that the trial court erred in failing to conduct a proper cumulative analysis. Because no errors were identified, no cumulative analysis is necessary. See, e.g., Rogers v. State, 957 So. 2d 538, 554 (Fla. 2007) (stating that because each claim is procedurally barred or without merit, the cumulative error claim must fail).

Sexton v. State, 997 So. 2d 1073, 1088-89 (Fla. 2008).

Petitioner's first sub-issue within his cumulative error claim is that the state postconviction court erred in limiting the scope of the evidentiary hearing.  This claim is not proper for federal habeas review as it does not raise a constitutional issue that calls into question his underlying conviction and

sentence.    Furthermore,  the  Florida  Supreme  Court  found  this claim was not properly preserved.

Sexton  next  argues  that  the  trial  court  erred  in summarily denying eleven guilt phase claims of ineffective assistance,  which  assert  that  counsel  failed  to  object  to prosecutorial  comment,  to  hearsay  testimony,  to  certain other  evidence,  and  during  voir  dire.[Footnote  13] Further,  despite  raising  eleven  claims  that  he  contends were  improperly  denied  without  an  evidentiary  hearing, Sexton has chosen not to present this Court with specific arguments  explaining  how,  in  each  instance,  counsel  was ineffective  or  what  prejudice  flows  from  the  deficiency. **Because  Sexton  does  not  provide  in  the  initial  brief  "an explanation  why  summary  denial  was  inappropriate  or  what factual  determination  was  required  on  each  claim  so  as  to necessitate  an  evidentiary  hearing,"  his  conclusory argument  is  insufficient  to  preserve  his  claim.** See Doorbal  v.  State,  983  So.2d  464,  482-83  (Fla.  2008) (citing  Randolph  v.  State,  853  So.2d  1051,  1063  n.  12 (Fla. 2003)).

Footnote 13: The eleven summarily denied claims are as follows:  (1)  failing  to  object  to  the  prosecutor's reference  to  his  "able"  investigator,  thereby bolstering  the  witness's  credibility;  (2)  failing  to object  to  certain  venire  members  walking  in  and  out  of the  courtroom  during  jury  selection;  (3)  failing  to object  when  the  State  introduced  a  religious  reference by  thanking  God  that  the  lawyers  were  not  on  trial; (4)  failing  to  request  individual  voir  dire  after  four venire  members  indicated  they  had  heard  details  of  the case;  (5)  failing  to  object  to  the  State's  opening statement  referring  to  expected  testimony  of  Sexton's sexual  abuse  of  Willie;  (6)  conceding  to  sexual  abuse and  unusual  relationships  in  the  Sexton  family,  which bolstered  the  State's  case;  (7)  failing  to  object  to the  State's  failure  to  lay  a  foundation  for introduction  of  testimony  from  the  Ohio  social  worker about  Sexton  fathering  two  of  his  daughter's  children; (8)  failing  to  object  to  questions  the  State  asked Willie  on  direct  examination  seeking  speculation  of how  he  and  others  felt  on  a  variety  of  issues,  and failing  to  object  to  testimony  by  Willie  to  hearsay statements;  (9)  failing  to  object  to  a  statement  from daughter  Pixie  about  a  threat  from  Sexton  that  was covered  by  the  previous  motion  in  limine;  (10)  failing

to object to the State's introduction of Sexton's
videotape directed to President Clinton; and (11)
failing to object to the State's disparaging remarks
about counsel during the State's closing argument.

"[W]hen reviewing a court's summary denial of an
initial rule 3.851 motion, an appellate court must accept
the movant's factual allegations as true, and the
appellate court will affirm the ruling only if the filings
show that the movant has failed to state a facially
sufficient claim or the existing record demonstrates that
there is no issue of material fact to be determined." Rose
v. State, 985 So.2d 500, 505 (Fla. 2008). We have made
clear through rule 3.851 that evidentiary hearings should
be the norm when there are factual issues to be developed.
But in this case, Sexton offers no new witnesses to cast
doubt on his guilt or new evidence that he claims counsel
should have presented. Essentially, he asserts that
counsel was deficient in not objecting to certain comments
during voir dire and in allowing certain testimony to come
before the jury. While those types of alleged deficiencies
can be a basis for an ineffective assistance of counsel
claim, merely asserting deficiency without more specific
factual allegations is insufficient to mandate an
evidentiary hearing. The trial court fully discussed each
claim, attached the relevant portions of the record, and
explained why, based on the facts in the record and the
applicable law, the requirements of Strickland were not
met. We have grouped similar claims together and will
discuss them briefly below.[Footnote 14]

Footnote 14: We reiterate our admonition made in
Doorbal that "[t]he purpose of an appellate brief is
to present arguments in support of the points on
appeal ... [and] to merely refer to arguments
presented during the postconviction proceedings
without further elucidation is not sufficient to
preserve issues." 983 So.2d at 482.

A. Failure to Object During Voir Dire

Sexton first contends that there were certain
comments made by the prosecutor during voir dire that were
improper and should have been objected to by counsel. We
have reviewed his claims and conclude there was no
impropriety in the comments and hence no deficiency. As to
Sexton's claim that counsel was ineffective for not
objecting to venire members walking in and out during voir
dire, this claim was properly denied because the record
confirms that counsel objected. Further, any complaint
regarding the trial court's response to this objection

should have been raised on direct appeal and is therefore procedurally barred. See Pooler v. State, 980 So.2d 460, 470 (Fla. 2008) (citing Spencer v. State, 842 So.2d 52, 60-61 (Fla. 2003)).

There is also no merit to Sexton's claim of alleged deficiency for failure to seek individual voir dire of four venire members who indicated they had heard or read details of the case because three of the jurors did not serve. As to the fourth, juror Hart, this claim is properly denied because Sexton failed to make any claim of actual bias, Carratelli v. State, 961 So.2d 312, 324 (Fla. 2007), and no evidence of bias appears in the record. As the trial court found, juror Hart stated that he had no opinions about the case based on what he had heard or read. Thus, the trial court correctly denied these claims without an evidentiary hearing.

B. Failure to Object to Comments During Opening and Closing Statements

First, Sexton alleges that counsel was ineffective for failing to object to prosecutorial comments in both opening and closing arguments. However, we have reviewed each of the alleged improper prosecutorial comments and agree with the trial court that none of the comments was improper under the facts of this case. Thus, this claim is without merit and was properly denied.

Second, Sexton argues that his counsel was ineffective for explaining in his opening statement that Sexton engaged in sexual abuse and unusual familial relationships. Defense counsel stated to the jury:

You're going to learn very quickly in this trial, if you haven't already, that Eddie Sexton is a far cry from the all American father. You're going to hear evidence that he engaged in conduct before he was arrested in this case with his children that could be considered reprehensible. You're going to learn that he took liberties with his children that may ask you- or may cause you to ask yourselves and wonder, can this kind of thing really happen; does this really go on. I'm here to tell you that the evidence will show that in the Sexton family this did go on.

This is a case about a very sick family. There will be a lot of mud thrown at the man sitting behind me-some of it true, some of it speculative, all of it ugly, all of it nasty, but none of it first-degree murder, and that is what you're here to decide. Eddie Sexton is not a murderer, and the only issue for you to pass upon is whether the evidence establishes that

he's guilty of first-degree murder or if he's not
guilty.

We conclude that there is no deficiency in this
regard. This evidence was to be admitted regardless of
whether it was discussed in opening statements and counsel
was simply referring to uncontradicted facts about
Sexton's relationship with his family. Sexton has failed
to demonstrate any deficiency in these comments of trial
counsel.

C. Failure to Object to Certain Testimony and Evidence

Sexton next argues that counsel was ineffective for
not objecting to certain testimony and the introduction of
evidence. Initially, Sexton argues that counsel was
ineffective for not objecting to the lack of foundation
for the testimony of Judy Genetin, an Ohio social worker,
in which she stated that paternity tests established that
Sexton fathered two children with his own daughter, Pixie.
On direct appeal from the first trial, this Court held:

> With respect to the evidence that Sexton had fathered
> two of Pixie's children, was involved in the death of
> Pixie and Joel's baby, and had engaged in a standoff
> with Ohio police that resulted in him becoming a
> fugitive, we find that the trial court did not abuse
> its discretion in ruling this evidence relevant.

Sexton, 697 So.2d at 837. Even if counsel should have
objected to the lack of foundation for Genetin's
knowledge, see Dep't of Health & Rehab. Servs. v. Moore,
603 So.2d 13, 14 (Fla. 5th DCA 1992) (holding that
paternity tests are not admissible where unauthenticated
and a predicate has not been laid), Pixie also testified
that Sexton was the father of two of her children.
Therefore, we conclude that no prejudice can be
established.

Next, Sexton contends that counsel was ineffective
for failing to object to a videotape of Sexton made by
Sexton for presentation to "the authorities," in which he
discussed his personal and family problems resulting from
the State of Ohio's removal of his children from his
custody for a period of time and which was ultimately the
impetus for Sexton's flight to Florida. Although counsel
stipulated to its admission if portions of the video
showing Sexton's children were excised, which they were,
Sexton failed to identify those specific portions of the
tape that were objectionable or prejudicial. As the Court
warned in Doorbal, nonspecific allegations are
insufficient to obtain an evidentiary hearing on claims of
ineffective assistance of counsel, and counsel should not

39

assume that specific arguments need not be presented until
the evidentiary hearing. 983 So.2d at 482. The problem is
compounded when no specific arguments are presented in the
appellate brief identifying the inadmissible portions of
the evidence that counsel should have objected to at
trial.

Sexton has not identified any specific legal basis on
which his attorney should have objected to any or all of
the videotape. In fact, portions of the video could be
interpreted as showing him in a sympathetic light as a
loving, if not severely troubled, father-all tending to
humanize him for the jury. In addition, Sexton chose not
to testify at trial, so the video allowed him to speak to
the jury without cross-examination. Finally, the video
contained information found to be relevant in the case,
including why Sexton fled to Florida and had a motive to
keep Joel from returning to Ohio.[Footnote 15] Because
portions of the video were clearly relevant and may even
have had a positive effect, Sexton has not demonstrated
that his counsel was deficient in failing to object on the
ground of relevance. Therefore, relief is not warranted on
this claim.

Footnote 15: Facts regarding the Ohio social services'
actions, the incident in which Sexton barricaded
himself in his home, and the fact that Sexton became a
fugitive were known to the jury because these facts
had been presented as evidence relevant to why the
family came to Florida and why Sexton was desperate to
keep Joel from returning to Ohio. See Sexton, 775
So.2d at 926.

D. Failure to Object to Speculation and Hearsay

Sexton claims that counsel was ineffective for
failing to object to numerous instances of hearsay
testimony. We have reviewed each of these assertions and
conclude that Sexton has not alleged a basis on which to
have an evidentiary hearing because he has not
demonstrated error in the trial court's admission of the
testimony. Accordingly, we affirm the trial court's
summary denial of these claims.

Sexton v. State, 997 So. 2d 1073, 1085-88 (Fla. 2008).

As this sub-claim was denied based on collateral counsel's

failure to properly preserve the claim in the Florida Supreme

Court, a valid state procedural law, he is not entitled to

federal habeas relief. Federal habeas corpus law is well settled that the failure of a habeas petitioner to adhere to state procedural rules regarding the timely presentation of claims will bar consideration of those claims in a subsequent federal habeas proceeding. See Wainwright v. Sykes, 433 U.S. 72 (1977); Spencer v. Kemp, 781 F.2d 1458, 1453 (11th Cir. 1986). The federal habeas court must defer to the state court's interpretations of its procedural rules, and must enforce those rules as well as enforcing the procedural rulings of the state courts. See, e.g., Lindsey v. Smith, 820 F.2d 1137 (11th Cir. 1987). The habeas courts will not challenge a state court's determination of state law. See Sims v. Singletary, 155 F.3d 1297, 1308 (11th Cir. 1998); Stringer v. Black, 503 U.S. 222, 235 (1992) ("It would be a strange rule of federalism that ignores the view of the highest court of a State as to the meaning of its own law."). Additionally, because the procedural default in the instant case was a result of collateral counsel's actions in the Florida Supreme Court, and there is no constitutional right to effective assistance of collateral counsel, Petitioner is unable to demonstrate "cause" for his failure to comply with Florida's procedural rules and that actual prejudice resulted from that failure. Wainwright v. Sykes, supra, at 91-94.

Although the state court addressed this sub-claim on the merits, this Court should still deny the instant claim. Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994); see also Coleman v. Thompson, 501 U.S. 722 (1991) (finding that adequate state ground doctrine applies to bar federal habeas review when the state court declined to address prisoner's federal claims because prisoner had failed to meet state procedural requirement); Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (stating that an alternative holding in which a state procedural bar is a sufficient basis for the state court's judgment is adequate to preclude a claim from being raised on habeas review, even when the state court also relies on federal law to deny the claim).

Petitioner's second sub-issue in his cumulative error claim relates to the admission of testimony at trial regarding the death of infant Skipper Lee Good.  This sub-issue is a reassertion of the claim contained in Ground I of Petitioner's habeas, which this Court has dismissed.  Likewise, the final sub-issue relates to trial counsel's failure to raise a contemporaneous objection to certain victim impact evidence. This claim was raised as Ground III of Petitioner's habeas which was also dismissed.

Because none of Petitioner's individual claims have merit, his attempt to bundle them into a cumulative error claim is

likewise without merit.  As the state court properly found, because no errors were found, the court was not required to conduct any cumulative error analysis.  Petitioner has failed to establish that the state courts' resolution of this claim was contrary to, or an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, this Court should deny Ground VIII of Petitioner's habeas petition.

WHEREFORE, based on the above arguments and citations of authority, Respondent respectfully requests that this Court deny Grounds V, VI, and VIII of the pending habeas petition.

Respectfully submitted,

BILL McCOLLUM
ATTORNEY GENERAL

s//Stephen D. Ake
STEPHEN D. AKE
Assistant Attorney General
Florida Bar No. 0014087
Counsel for Respondents
Concourse Center 4
3507 East Frontage Road, Suite 200
Tampa, Florida 33607-7013
Telephone: (813) 287-7910
Facsimile: (813) 281-5501
E-mail: stephen.ake@myfloridalegal.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of October, 2009, I electronically filed the foregoing RESPONDENT'S ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIMS V, VI, AND VIII with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Robert T. Strain, Assistant CCRC-Middle, 3801 Corporex Park Drive, Suite 210, Tampa, Florida 33619-1136, e-mail: strain@ccmr.state.fl.us.

s// Stephen D. Ake
STEPHEN D. AKE
Assistant Attorney General
Florida Bar No. 0014087
Counsel for Respondents
Concourse Center 4
3507 East Frontage Road, Suite 200
Tampa, Florida 33607-7013
Telephone: (813) 287-7910
Facsimile: (813) 281-5501
E-mail: stephen.ake@myfloridalegal.com